# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

<table>
<tr><td>IN RE WEWORK LITIGATION</td><td>)<br>)  Consolidated<br>)  C.A. No. 2020-0258-AGB<br>)</td></tr>
</table>

## OPINION

Date Submitted:  October 29, 2020
Date Decided:  December 14, 2020

William B. Chandler III, Brad D. Sorrels, Lori W. Will, Lindsay Kwoka Faccenda, Leah E. Brenner, and Jeremy W. Gagas, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Michael S. Sommer, WILSON SONSINI GOODRICH & ROSATI, P.C., New York, New York; David J. Berger, Steven M. Guggenheim, and Dylan G. Savage, WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Attorneys for Plaintiff The We Company.*

William M. Lafferty, Kevin M. Coen, Sabrina M. Hendershot, and Sara Toscano, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, Delaware; Eric Seiler, Philippe Adler, and Mala Ahuja Harker, FRIEDMAN KAPLAN SEILER & ADELMAN LLP, New York, New York; William Christopher Carmody, Shawn J. Rabin, and Arun Subramanian, SUSMAN GODFREY L.L.P., New York, New York; *Attorneys for Plaintiffs Adam Neumann and We Holdings LLC*.

Robert S. Saunders and Sarah R. Martin, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; George A. Zimmerman, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York; *Attorneys for The We Company.*

Elena C. Norman, Rolin P. Bissell, and Nicholas J. Rohrer, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Erik J. Olson, MORRISON & FOERSTER LLP, Palo Alto, California; James Bennett and Jordan Eth, MORRISON & FOERSTER LLP, San Francisco, California; *Attorneys for Defendant SoftBank Group Corp.*

Michael A. Barlow and E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; John B. Quinn and Molly Stephens, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Los Angeles, California; *Attorneys for Defendant SoftBank Vision Fund (AIV M1) L.P.*

**BOUCHARD, Chancellor**

This decision resolves a motion to dismiss that pits two committees of the board of directors of The We Company ("WeWork" or the "Company") against each other concerning a lawsuit arising out of a multi-step transaction that was designed to rescue WeWork from a liquidity crisis and to transfer control of the Company from one of its co-founders (Adam Neumann) to SoftBank Group Corp. ("SBG") and SoftBank Vision Fund (AIV MI) L.P. ("Vision Fund" or "SBVF"). Resolving the motion turns on an issue of first impression: Should a temporary committee of a board of directors created in response to the filing of a lawsuit against the corporation's new controlling stockholders (SBG and Vision Fund) be permitted to terminate the lawsuit, which an earlier committee of the board filed on behalf of the corporation with the support of the Company's management and its outside counsel to enforce the corporation's contractual rights against them?

The first committee (the "Special Committee") was formed to evaluate the company's strategic alternatives and to negotiate a potential transaction in the wake of its liquidity crisis. The Special Committee ultimately negotiated the terms of a transaction embodied in a Master Transaction Agreement (the "MTA"), dated as of October 22, 2019, among WeWork, SBG, Vision Fund, Neumann, and an entity controlled by Neumann called We Holdings LLC. The MTA obligated SBG to do three things in the following order: (i) provide the Company with $1.5 billion of equity financing, (ii) purchase up to $3 billion of the Company's stock from

1

Neumann and minority stockholders of the Company in a tender offer (the "Tender Offer"), and (iii) provide the Company with up to $5.05 billion of debt financing. When the WeWork board formed the Special Committee, its two members (Bruce Dunlevie and Lewis Frankfort) and entities affiliated with them together held over 34 million shares of WeWork. In forming the Special Committee, with full knowledge that its members might participate in the Tender Offer, the WeWork board resolved that Dunlevie and Frankfort were free of any material conflict of interest relating to the potential transaction.

The closing of the Tender Offer was subject to certain conditions, including the roll-up of a joint venture known as ChinaCo (the "ChinaCo Roll-Up"). SBG and Vision Fund both were obligated under the MTA to use their reasonable best efforts to complete the ChinaCo Roll-Up and to satisfy other conditions necessary to consummate the Tender Offer.

SBG commenced the Tender Offer on November 22, 2019. The Tender Offer became oversubscribed, with over 90% of the shares eligible to tender doing so, including the shares held by Dunlevie, Frankfort, and their affiliates.

On December 27, 2019, the Company, SBG, and Vision Fund approved an amendment to the MTA to allow the debt financing to commence before the Tender Offer closed. Neumann, a party to the MTA, refused to consent to this amendment.

On April 1, 2020, SBG terminated the Tender Offer, asserting that certain closing conditions to the Tender Offer—in particular the failure to complete the ChinaCo Roll-Up—had not been satisfied. On April 7, 2020, the Special Committee filed this action against SBG and Vision Fund asserting, among other things, that they had breached contractual obligations to use their reasonable best efforts to complete the ChinaCo Roll-Up and to close the Tender Offer.

The Company, through its outside counsel (Skadden, Arps, Slate, Meagher, & Flom LLP), encouraged the Special Committee to file the lawsuit. The Company's Chief Legal Officer and Skadden, who both believed that the Special Committee was authorized to sue SBG and Vision Fund to enforce the terms of the MTA, commented on drafts of the complaint subject to a common interest privilege.

SBG's reaction to the lawsuit was swift. Its Chief Operating Officer and Chief Legal Officer reached out to the CEO and Chief Legal Officer of WeWork, respectively, criticizing the filing of the lawsuit, as did SBG's outside counsel in a letter addressed to the WeWork board. Soon thereafter, Skadden devised a strategy to form a new committee of the WeWork board consisting of two new temporary directors who would be tasked with determining whether the Special Committee should be permitted to press the lawsuit against SBG and Vision Fund.

On May 29, 2020, by a 6-2 vote—with at least five conflicted directors voting in favor and with the two Special Committee members voting against—the WeWork

board formed a new committee (the "New Committee") and authorized it to determine if "the Special Committee has or should have" the authority "to commence and/or continue the litigation" it filed on behalf of the Company against SBG and Vision Fund.

On July 28, 2020, the New Committee issued its report (the "Report"), finding, among other things, that the Special Committee did not have the authority to file this action when it did and should not have the authority to continue this action now. At the direction of the New Committee, WeWork moved under Court of Chancery Rule 41(a) for leave to voluntarily dismiss the complaint the Company filed at the direction of the Special Committee. The Special Committee opposes the motion.

The first question raised by the Rule 41(a) motion is what standard of review the court should apply. The parties proposed four different standards of review, which span the full spectrum of judicial scrutiny. For the reasons explained below, the court concludes that something akin to the standard our Supreme Court articulated in *Zapata Corp. v. Maldonado*[1] best fits the unique circumstances of this case and, based on the application of that standard to the evidence of record, that the Rule 41(a) motion should be denied.

---

[1] 430 A.2d 779 (Del. 1981).

4

## I.    BACKGROUND

The facts recited in this opinion come from the pleadings in this action and the parties' submissions concerning the motion of the Company, filed at the direction of the New Committee, for leave to dismiss under Court of Chancery Rule 41(a) the complaint filed at the direction of the Special Committee.[2]  Any additional facts are subject to judicial notice.

### A.    The Players

WeWork is a privately-held global real estate company specializing in shared workspaces that was co-founded by Adam Neumann, the managing member of We Holdings LLC, a Delaware limited liability company.  For simplicity, this decision refers to Adam Neumann and We Holdings LLC together as "Neumann" and refers to Adam Neumann individually as "Mr. Neumann."

SBG is incorporated under the laws of Japan and headquartered in Tokyo, Japan.  Masayoshi Son founded SBG's predecessor in 1981 and serves as SBG's Chairman and Chief Executive Officer.  At the times relevant to this action, SBG's Chief Operating Officer was Marcel Claure and its Chief Legal Officer was Adam Townsend.

---

[2] Two separate civil actions were consolidated into this action for purposes of discovery and trial while maintaining separate pleadings for the different plaintiffs.  *See* Dkt. 109.

Vision Fund, a Delaware limited partnership, was founded by Son. Vision Fund's website describes its "Leadership" as comprised of three people: Son, Ron Fisher, and Rajeev Misra.[3] Fisher has been a member of SBG's board since 1997 and Vice Chairman of SBG since 2017.[4] Misra has been a member of SBG's board since 2017 and an Executive Vice President of SBG since 2018.[5] Vision Fund is managed by its general partner, SB Investment Advisers (UK) Limited, which is wholly-owned by SBG and which makes investment decisions for Vision Fund through a three-person Investment Committee, which includes Son and Misra.[6] SBG and Vision Fund issue consolidated financial statements in which they jointly describe their investments in WeWork and acknowledge that SBG has control over Vision Fund.[7]

As of March 18, 2020, SBG owned approximately 43.4% of WeWork's fully-diluted equity (including options and warrants) and Vision Fund owned approximately 8.9% of the Company's fully diluted equity.[8] Together, SBG and

---

[3] *The Team*, SoftBank Vision Fund, https://visionfund.com/team (last visited Dec. 14, 2020).

[4] Verified Am. Compl. ("Neumann Compl.") ¶ 13 (Dkt. 131); Vision Fund's Answer to Neumann Compl. ("Vision Fund Answer"), at 7 (Dkt. 477).

[5] Neumann Compl. ¶ 13; Vision Fund Answer 7.

[6] Neumann Compl. ¶ 14; Vision Fund Answer 8.

[7] Neumann Compl. ¶ 16; Vision Fund Answer 9.

[8] Daines Decl. ¶ 21 (Dkt. 388).

Vision Fund hold a total of 52.3% of the Company's fully-diluted equity but no more than 49.9% of the combined voting power of the Company's voting securities.[9] At the times relevant to this decision, the WeWork board of directors (the "Board") controlled the proxy for Neumann's shares of WeWork, which represents 14.1% of the Company's equity on a fully-diluted basis.[10]

This decision at times refers to SBG and Vision Fund together as "SoftBank," as the parties often have done in their submissions.

### B. Formation of the Special Committee

In October 2019, after the well-publicized failure of its initial public offering, WeWork was facing a liquidity crisis.[11] To address the crisis, the Company considered proposals from JPMorgan Chase Bank, N.A. and SBG.[12]

On October 12, 2019 the Board approved resolutions to form the Special Committee, consisting of Bruce Dunlevie and Lewis Frankfort, to evaluate a "Potential Transaction" (the "October 12, 2019 Resolutions").[13] Dunlevie co-founded Benchmark Capital ("Benchmark"), which together with Dunlevie hold

---

[9] *Id.*

[10] *Id.*; *see also* Martin Decl. Ex. 5 ("Stockholders' Agreement"), § 5.08 (Dkt. 372).

[11] Martin Decl. Ex. 4 ("Disclosure Statement"), at 21-22.

[12] *See id.* 16-21.

[13] Martin Decl. Ex. 2, Annex A (October 12, 2020 Resolutions of the Board).

approximately 32.6 million shares of WeWork.[14]  Frankfort, the former executive chairman of Coach, co-founded Benvolio Capital ("Benvolio"), which holds approximately 2.1 million shares of WeWork.[15]  After reviewing the "background and relationships" of Dunlevie and Frankfort, and considering that they might participate in the tender offer,[16] the Board determined that they both were "free of any material conflict of interest relating to a Potential Transaction, SoftBank and Adam Neumann."[17]

The October 12, 2019 Resolutions define the term "Potential Transaction" to refer to a transaction proposed by "SoftBank" (defined to include SBG, Vision Fund and their respective affiliates) and other strategic alternatives available to the Company, including an alternative debt financing arrangement with J.P. Morgan.[18] SoftBank's proposed transaction included, among other things, "debt financing arrangements, a tender offer by SoftBank for Company equity, . . . amendments to SoftBank's $1.5 billion warrant agreement with the Company, and changes to the Company's governance . . . in connection with Mr. Neumann ceasing to be Chief

---

[14] Martin Decl. Ex. 15 ("Report"), at 8, 38; Disclosure Statement at 28.

[15] Report at 8, 38; Disclosure Statement at 28.

[16] Will Decl. Ex. X ("Robinson Dep."), at 18 (Dkt. 387).

[17] Martin Decl. Ex 2, Annex A.

[18] *Id.*

8

Executive Officer of the Company."[19] The October 12, 2019 Resolutions expressly acknowledged that SoftBank's proposed transaction, "if fully consummated, would result in SoftBank acquiring majority economic ownership and voting control of the Company [and] Mr. Neumann ceasing to have voting control" of the Company.[20]

The October 12, 2019 Resolutions authorized the Special Committee only to recommend a Potential Transaction to the Board and, subject to that qualification, delegated to the Special Committee "all rights and powers of the Board to the fullest extent permitted by the Delaware General Corporation Law in connection with a Potential Transaction."[21] The law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), which advised the WeWork Board when it approved the Resolutions, drafted the October 12, 2019 Resolutions at the direction of Graham Robinson, a Skadden M&A partner who was the "lead deal person" on the transaction.[22]

On October 13, 2019, Robinson and Larry Sonsini of Wilson Sonsini Goodrich & Rosati P.C. ("Wilson Sonsini"), counsel to the Special Committee, recommended that the Board revise the October 12, 2019 Resolutions.[23] The Board

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] Will Decl. Ex. Y ("Berrent Dep."), at 49; Robinson Dep. 11, 50-51.

[23] Martin Decl. Ex. 3 (October 13, 2019 Board Minutes), at 2.

then approved additional resolutions (the "October 13, 2019 Resolutions") that delegated to the Special Committee the authority to adopt and approve a Potential Transaction on behalf of the Company without any further approval of the Board, except to the extent otherwise required by law or regulation.[24] This decision hereafter refers to the October 12, 2019 and October 13, 2019 Resolutions together as the "Resolutions."

### C. The MTA and Stockholders' Agreement

On October 22, 2019, the Company, Neumann, SBG, and Vision Fund entered into a Master Transaction Agreement (as defined above, the "MTA"), which the Special Committee authorized and approved on behalf of the Company.[25] Shortly before the MTA was executed, a Skadden partner (Laura Knoll) advised a Board observer (Michael Eisenberg) in an email that the "Special Committee, acting through the Company, has the ability to sue for specific performance to cause SoftBank to do the tender offer."[26]

The MTA obligated SBG, subject to certain terms and conditions, to undertake three significant transactions with WeWork and its stockholders in the following order: (i) provide WeWork with $1.5 billion of equity financing (the

---

[24] *Id.*

[25] Will Decl. Ex. B (October 22, 2019 Special Committee Minutes), at 2 & Annex A (October 22, 2019 Special Committee Resolutions), at 3 (Dkt. 386).

[26] Will Decl. Ex. G (Email exchange between G. Robinson, L. Knoll, and M. Eisenberg).

"Equity Financing");[27] (ii) purchase up to $3 billion of WeWork stock from Neumann and other stockholders of the Company in a tender offer at a per share price of no less than $19.19 (as defined above, the "Tender Offer");[28] and (iii) provide WeWork with up to $5.05 billion in debt financing (the "Debt Financing").[29] The Debt Financing had three components: providing credit support for a letter of credit facility for up to $1.75 billion, purchasing up to $2.2 billion in senior unsecured notes, and providing $1.1 billion of senior secured debt financing.[30]

Section 2.03(b) of the MTA required the parties to enter into a stockholders' agreement (the "Stockholders' Agreement").[31] The Stockholders' Agreement, dated as of October 30, 2019, provided for the following changes to the Company's governance structure.

- SBG and Vision Fund would have the right to designate to the Board five of the Company's ten directors, of which at least one would be designated by Vision Fund.[32]

- SBG would have the right to designate one of its directors as executive chairman of the Board.[33]

---

[27] Verified Compl. ("Compl.") Ex. A. ("MTA"), § 2.01 (Dkt. 1).

[28] *Id.* § 3.01(a).

[29] *Id.* §§ 4.01(a)-(b).

[30] *Id.*

[31] *Id.* § 2.03(b).

[32] Stockholders' Agreement § 2.01(b)(ii).

[33] *Id.* § 2.01(b)(v).

11

- WeWork investors Benchmark and Hony Capital Ltd. each would have the right to designate one director to the Board.[34]

- Stockholders other than Mr. Neumann, SBG, Vision Fund and their respective affiliates would have the right to appoint two directors to the Board.[35]

- Special Committee member Frankfort would remain on the Board for a specified period of time, after which he would be replaced by the Chief Executive Officer of the Company.[36]

- Mr. Neumann executed a proxy giving voting control of his super-voting founder shares to the Board.[37]

As to Frankfort's tenure on the Board, the Stockholders' Agreement specifically provided that he would continue to serve as a director at least until any material litigation with SBG concerning the transactions in the MTA, including the Tender Offer, had been finally resolved:

> Until the later of (x) time as the Company has consummated the transactions contemplated by [the MTA] . . . and *finally resolved any litigation or disputes (other than immaterial claims) with SBG arising therefrom (including with respect to the Tender Offer (as defined in the MTA))* or (y) consummation of the Tender Offer . . . Lewis Frankfort shall serve as a Director unless earlier removed pursuant to Section 2.01(d).[38]

---

[34] *Id.* § 2.01(b)(ii).

[35] *Id.* § 2.01(b)(iii).

[36] *Id.* § 2.01(b)(iv).

[37] *Id.* § 5.08.

[38] *Id.* § 2.01(b)(iv) (emphasis added).

Sections 8.03(a), 8.09, and 8.12 of the MTA obligate SBG and Vision Fund to use their "reasonable best efforts" to complete certain closing conditions to the Tender Offer, including a "roll up" of two of WeWork's joint ventures, known as PacificCo and ChinaCo.[39] The "ChinaCo Roll-Up" involved a subsidiary of WeWork acquiring from Vision Fund shares in ChinaCo, a company WeWork used to conduct operations in China.[40] In exchange for these shares of ChinaCo, Vision Fund would receive WeWork shares.[41]

Section 11.14 of the MTA provides that, for a defined period, WeWork must receive approval from the Special Committee before taking any action against SBG under the MTA and WeWork must pay the fees and expenses of any professional advisors to the Special Committee.[42] Specifically, Section 11.14 of the MTA states, in its entirety, that:

> Following the occurrence of the Board Change and until the later of the consummation of the Debt Financing and the Tender Offer, (a) any action or determination by the Company to exercise rights or enforce remedies against SBG under this Agreement shall require the approval of the Special Committee and (b) the Company shall pay, on behalf of the Special Committee, for any reasonable and documented fees and expenses of professional advisors or other representatives of the Company.[43]

---

[39] *See* MTA §§ 8.03(a), 8.09, 8.12.

[40] MTA Ex. O (ChinaCo Share Purchase Agreement Term Sheet), at 1.

[41] *Id.*

[42] MTA § 11.14.

[43] *Id.*

13

## D. Disclosures Concerning the MTA and the Tender Offer

On October 28, 2019, WeWork sent a detailed 29-page letter to its stockholders seeking certain approvals and waivers, including approval of the transactions contemplated by the MTA (the "Disclosure Statement").[44] The Disclosure Statement explained the background of the transactions included in the MTA and provided a summary of the MTA's terms.[45] In explaining how the Board would be reconstituted, the Disclosure Statement represented that Frankfort would remain on the Board "until the later of (a) the completion of the SoftBank Transactions (*including the resolution of any litigation disputes with SoftBank with respect to the SoftBank Transactions*) and (b) consummation of the Tender Offer."[46] The term "SoftBank Transactions" was defined in the Disclosure Statement to include the Tender Offer.[47]

The Disclosure Statement highlighted that each of the directors on the Board would be eligible to participate in the Tender Offer and disclosed the number of shares attributable to each director and the value of those shares at the Tender Offer

---

[44] *See* Disclosure Statement at 1, 9-11.

[45] *Id.* at 1, 14-21.

[46] *Id.* at 2 (emphasis added).

[47] *Id.* at 1.

price of $19.19 per share.[48]  Specifically, the Disclosure Statement attributed 32,645,314 shares to Dunlevie and 2,099,342 shares to Frankfort having an aggregative value (at $19.19 per share) of approximately $626.4 million and $40.3 million, respectively.[49]  Assuming a proration rate of 56% if all eligible shares were tendered, the shares accepted in the Tender Offer attributable to Dunlevie and Frankfort would yield proceeds of approximately $350.8 million and $22.6 million, respectively.[50]

On November 22, 2019, SBG commenced the Tender Offer.  In explaining how the Board had been reconstituted in accordance with the Stockholders' Agreement, the Offer to Purchase for the Tender Offer (the "Offer to Purchase") represented that Frankfort would remain on the Board during the pendency of any material litigation with SoftBank (defined to include SBG and Vision Fund) concerning the Tender Offer:

- the board was reconstituted to have up to 10 members, initially consisting of: . . .

    o one director (Lew Frankfort) from the special committee until the later of (a) the completion of the transactions described in the master transaction agreement (***including the resolution of any litigation disputes*** (other than immaterial claims) ***with SoftBank arising therefrom (including with respect to the***

---

[48] *Id.* at 27-28.  The Disclosure Statement separately noted Neumann's right to participate in the Tender Offer.  *See id.* at 3, 12-13.

[49] *Id.* at 28.

[50] *Id.*

*offer*)) and (b) the consummation of the offer, at which point (i) Mr. Frankfort shall be removed from the board and the special committee and (ii) the special committee will be dissolved (and following Mr. Frankfort's removal, the Company's then chief executive officer (if any) will be appointed to the board).[51]

## E.    Amendment No. 1 to the MTA

On December 27, 2019, the Company, Vision Fund, and SBG signed Amendment No. 1 to the MTA ("Amendment No. 1").[52] Amendment No. 1 changed the sequencing of the transactions set forth in the MTA to allow the Debt Financing to occur either "before or after the Tender Offer Closing Time" instead of requiring that the Tender Offer close before the Debt Financing could commence.[53] Amendment No. 1 also changed the initial expiration date of the Tender Offer from "twenty (20) Business Days . . . after the date the Tender Offer is first commenced"[54]—which already had passed—to the set time of "one minute following 11:59 p.m., New York City time, on April 1, 2020."[55]

---

[51] Will Decl. Ex. A (Offer to Purchase Equity Securities of The We Company), at WeWork_00000432 (emphasis added).

[52] *See* Compl. Ex. B ("Amendment No. 1").

[53] *Id*. § 3.

[54] MTA § 3.01(a).

[55] Amendment No. 1 § 2.

16

Mr. Neumann and We Holdings LLC, both parties to the MTA, did not approve Amendment No. 1.[56] They contend that SBG and Vision Fund breached the MTA by failing to obtain their consent to Amendment No. 1.[57]

## F. Management and Company Counsel Collaborate with the Special Committee to Sue SBG and Vision Fund for Breaching the MTA

On March 5, 2020, Trustbridge Partners ("Trustbridge") and WeWork signed a term sheet concerning ChinaCo that allegedly was inconsistent with terms contemplated in the MTA for completing the ChinaCo Roll-Up, a closing condition of the Tender Offer.[58] Around this time, the Company's management became concerned that SBG was violating the MTA by failing to use its reasonable best efforts to complete the ChinaCo Roll-Up. Robinson testified he "had been told by management of the company that they believed that SoftBank . . . had sought to frustrate the ChinaCo condition."[59] Jennifer Berrent, WeWork's Chief Legal Officer, testified "[she did] not believe SoftBank used reasonable best efforts to complete the ChinaCo transaction."[60]

---

[56] *See* Neumann Compl. ¶¶ 53, 73, 83.

[57] *Id.*

[58] *See* Houston Decl. Ex. 3 (WeWork ChinaCo Restructuring and Follow-On Investment Term Sheet, dated March 5, 2020) (Dkt. 160).

[59] Robinson Dep. 43.

[60] Berrent Dep. 136; *see also id.* 139-40.

On March 16, 2020, Robinson of Skadden sent an email to Wilson Sonsini, stating that "the committee may need to make a decision soon about whether it will bring a lawsuit against SoftBank on behalf of the company."[61] Skadden and Berrent both believed at the time that the Special Committee had the authority to sue SBG and Vision Fund to enforce the terms of the MTA. Robinson later told the New Committee that when "the Special Committee was originally created to negotiate the MTA, he had *no doubt* that if litigation were going to ensue over the MTA, the Special Committee would be the entity to pursue it."[62] Berrent, who raised no concerns about the Special Committee's authority to bring litigation during this period,[63] testified similarly:

> Q. . . . from an authority, legal authority, technical authority point of view, you believed the Special Committee had the authority to - - and had full authority how to handle how to respond to SoftBank with respect to issues arising out the MTA; correct?
>
> A. Yes.[64]

On March 24, 2020, during a Special Committee meeting, the Special Committee "summarized and discussed" previous conversations between the

---

[61] Will Decl. Ex. I (March 16, 2020 email exchange between Robinson and Larry Sonsini).

[62] Will Decl. Ex. F (New Committee memorandum dated June 10, 2020), at 6 (emphasis added); *see also* Robinson Dep. 59 ("This appears to me to delegate to the Special Committee all of the power of the board in respect of the matter, so it would appear to give the Special Committee the power to commence litigation.")

[63] *See* Robinson Dep. 47-48.

[64] Berrent Dep. 58-59.

Special Committee members and Sandeep Mathrani,[65] who had been hired as WeWork's CEO in February 2020 by Marcelo Claure, SBG's Chief Operating Officer.[66] Minutes of the meeting reflect that "Mr. Mathrani expressed on multiple occasions his concerns that litigation related to the tender offer could have adverse consequences."[67]

On March 27, 2020, Wilson Sonsini emailed multiple attorneys at Skadden, including Robinson and Knoll, a "working draft" of a complaint against SBG and Vision Fund to be brought by WeWork at the direction of the Special Committee.[68] Wilson Sonsini's cover email welcomed comments from Skadden, noted that the draft was being provided to Skadden "pursuant to a common interest privilege," and stated that "[t]he draft complaint assumes that SoftBank does not close the tender offer on April 1, and that we file on April 2."[69]

---

[65] *See* Dkt. 504, Ex. A (March 24, 2020 Special Committee Minutes), at WeWork-_00232293.

[66] Will Decl. Ex. Z ("Mathrani Dep."), at 16.

[67] Dkt. 504, Ex. A, at WeWork_00232293 (emphasis added).

[68] Will Decl. Ex. J (Email from Lori Will of Wilson Sonsini to various Skadden attorneys attaching draft complaint), at DNP000786.

[69] *Id.*

On April 1, 2020, SBG terminated the Tender Offer, asserting that certain closing conditions to the Tender Offer were not satisfied, one of which was the ChinaCo Roll-Up.[70]

Around midnight on April 1, Knoll of Skadden emailed several Wilson Sonsini attorneys Skadden's "thoughts on the complaint," including an updated draft of the complaint.[71] Knoll's email asked Wilson Sonsini to consider "whether to take an approach in the complaint that expresses more outrage over SoftBank's actions in frustrating the ChinaCo condition," noting that "[t]he current, more factual tone could be a strategic decision by the Committee so we just wanted to raise for consideration."[72]

Over the next several days, Skadden and Wilson Sonsini discussed the draft complaint and continued to share information.[73] In an email exchange on April 6, Skadden confirmed that Wilson Sonsini did not object to "sharing the paragraphs on the lease renegotiation" in the draft complaint with Berrent, "subject to a common interest privilege."[74]

---

[70] Will Decl. Ex. H (Notice Regarding Termination and Withdrawal of Offer to Purchase Equity Securities of The We Company).

[71] Will Decl. Ex. K (Email from Knoll to various Wilson Sonsini attorneys), at DNP000949.

[72] *Id.*

[73] *See* Will Decl. Ex. L (Email exchange between Will and Knoll).

[74] *Id.* at DNP001041.

## G.    The Litigation

On April 7, 2020, the Special Committee, acting on behalf of WeWork, filed a Verified Complaint against SBG and Vision Fund asserting two claims (the "Complaint").[75]   This decision refers to this lawsuit, at times, as the "MTA Litigation."  Count I of the Complaint asserts that SBG and Vision Fund breached certain provisions in the MTA, in particular their "obligation to use reasonable best efforts to consummate the transactions contemplated by the MTA, including the Tender Offer and the roll-up of ChinaCo."[76]  Count II asserts that SBG and Vision Fund breached their fiduciary duties as the Company's controlling stockholders.[77]

The Complaint alleges that the failure to close the Tender Offer not only harmed stockholders who had tendered shares for purchase, but also would harm the Company because "SoftBank's refusal to close the Tender Offer means that the Company could be denied the $1.1 billion in senior secured debt financing that SoftBank committed to in the MTA," which was "contingent upon completion of the Tender Offer."[78]

---

[75] *See generally* Compl. ¶¶ 89-104.

[76] *Id.* ¶ 92.

[77] *Id.* ¶ 101.

[78] *Id.* ¶ 21.  The $1.1 billion of debt financing referenced in the Complaint was one of three components of the $5.05 billion of debt financing commitments SBG undertook in the MTA.  *See* MTA § 4.01(a)-(b).  On April 15, 2020, SBG represented to the court that it previously had addressed the other two components—backstopping a $1.75 billion letter

21

On May 4, 2020, four weeks after the Special Committee filed suit, Neumann filed a complaint against SBG and Vision Fund in a separate action (C.A. No. 2020-0329-AGB) (the "Neumann Complaint"). The Neumann Complaint, as amended, asserts claims for breach of contract and breach of fiduciary duty similar to those asserted in the Special Committee's Complaint.[79] On May 28, the court entered an order consolidating the two actions for discovery and trial while maintaining separate pleadings for the different plaintiffs.[80]

## H. SBG Challenges the Special Committee's Authority to Pursue Its Lawsuit

On April 8, one day after the Special Committee filed its Complaint, Sandeep Mathrani received an email from Claure.[81] Despite Mathrani's conversations with Special Committee members where he expressed concern before the Complaint was filed that "litigation related to the tender offer could have adverse consequences,"[82] Mathrani testified in deposition that he did not learn about the Special Committee's lawsuit until after it was filed and that he had never seen or read the MTA.[83]

---

of credit facility in February 2020 and providing $2.2 billion in committed debt financing. *See* Dkt. 14 (SBG's Opp'n to Pl.'s Mot. for Expedited Proceedings), at 4.

[79] *See generally* Neumann Compl. ¶¶ 70-90.

[80] Dkt. 109.

[81] Dkt. 402 (April 8, 2020 email exchange between Claure and Mathrani).

[82] *See* Dkt. 504, Ex. A, at WeWork_00232293.

[83] Mathrani Dep. 20-21.

Claure's April 8 email to Mathrani provided some "recommendations" on how WeWork should respond to the lawsuit the Special Committee filed on behalf of the Company that were different from recommendations Mathrani apparently had received internally at the Company:

> My recommendations are a bit different than Lauren's.[84]  I am writing to just you because it is your choice.  You can select my recommendations or not.  But I want to share them with you.
>
> First, I think that you should address point #1.  These are the same talking points that we have been using.  Nothing new here.  The tender would not have benefited the company.  Therefore, it has no impact on WeWork's ability to executive [sic] its 5-year plan and be successful. I don't think *we* should miss an opportunity to reiterate these facts.
>
> Secondly, I think that *we* should take the opportunity to clarify that the complaints [sic] were brought by the Special Committee – not the full board.  The Special Committee is comprised of only 2 board members, 1 of which stands to benefit significantly from the tender offer.  These are the facts.  And laying out the facts will help to mitigate the storyline that WeWork has a divided board that might somehow encumber the future of the company.[85]

Within ninety minutes of receiving Claure's email, Mathrani replied that he would follow Claure's "recommendations," stating: "We will make the statements as below."[86]

---

[84] The reference to "Lauren" appears to refer to Lauren Fritts, WeWork's Chief Communications Officer.  *Id*. at 119.

[85] Dkt. 402 (emphasis added).

[86] *Id.*

On April 17, 2020, SBG and Vision Fund moved to dismiss the Complaint.[87] The same day, SBG's outside counsel sent a letter to the Board challenging the authority of the Special Committee to file the lawsuit and asserting that each of its members "faces material, disabling conflicts between their personal financial desire to reduce their stake in WeWork by selling their shares to SBG [in the Tender Offer] and the separate interests of WeWork."[88] SBG asked "that the Board move quickly to confirm that the Special Committee is not authorized to act on behalf of WeWork in the present lawsuit."[89]

Around the time SBG sent its April 17 letter to the Board, SBG's Chief Legal Officer, Robert Townsend, called Berrent.[90] Townsend told Berrent he thought she "was conflicted as a tendering stockholder," "that Skadden had a conflict" because there was a "question related to [the] interpretation of [the] resolutions adopted at the time of the MTA," and that "he would move to have [Berrent and Skadden] recused."[91] Berrent disagreed with Townsend's assertion that she was conflicted.[92] Townsend also told Berrent during their call "that he thought a committee of John

---

[87] *See* Dkts. 30, 31.

[88] Martin Decl. Ex. 6 (April 17, 2020 Letter from Softbank to the Board), at 1.

[89] *Id.* at 3.

[90] Berrent Dep. 33-35.

[91] *Id.* at 34-35, 40.

[92] *Id.* at 32.

Zhao, who is a director, . . . and Sandeep Mathrani could be an independent committee."[93]

After her call with Townsend, Berrent called Robinson to relay what Townsend had said to her.[94] Berrent and Robinson later "talked about the proposal of having a committee" but she "did not think that John Zhao could be independent . . . [a]nd Skadden explained that under Delaware law, . . . [Mathrani] would not be independent because of his role as CEO and the ability in that context for him to be terminated by SoftBank."[95]

On April 20, 2020, the Special Committee's counsel sent a letter to the Board, maintaining that the Special Committee did not have a disabling conflict preventing it from continuing the litigation and saying that every other member of the Board had a conflict of interest.[96] The Special Committee's letter also contended it had the proper authority to continue the litigation, citing various provisions in the MTA, disclosures sent to the Company's stockholders in connection with the MTA, and

---

[93] *Id.* at 35-36.

[94] *Id.* at 41.

[95] *Id.* at 42.

[96] Martin Decl. Ex. 7 (April 20, 2020 Letter from Special Committee to the Board), at 4-5, 7.

the Resolutions.[97]  This decision refers to SBG's April 17 letter to the Board and the Special Committee's April 20 letter to the Board, together, as the "Correspondence."

## I.     Formation of the New Committee

On April 22, 2020, Skadden litigation partner Robert Saunders sent an email to Berrent and Jared DeMatteis, WeWork's general counsel, attaching "draft bullet points to guide the discussion" the next day with Mathrani and other members of the Company's management about forming a new committee.[98]  The first bullet point recites "that the company"—meaning WeWork's management—"badly wants to get out of the middle of the litigation against SoftBank."[99]  The bullet points recommend using a new committee "to affirmatively divest the special committee of litigation authority."[100]  Skadden opines that Mathrani could not be considered independent for this task:  "Sandeep, because SoftBank was involved in identifying you as CEO, you could not be considered independent."[101]

On April 29, 2020, the Board met to discuss how to proceed in light of the competing letters it had received from SBG and the Special Committee's counsel.[102]

---

[97] *Id.* at 3-4.

[98] Martin Decl. Ex. 8 (April 22, 2020 email sent by Robert Saunders), at WW_New Committee_00011641; *see also* Mathrani Dep. 49-50.

[99] Martin Decl. Ex. 8, at WW_New Committee_ 00011642; *see also* Mathrani Dep. 51.

[100] Martin Decl. Ex. 8, at WW_New Committee_ 00011643.

[101] *Id.*

[102] *See* Martin Decl. Ex. 10 (April 29, 2020 Board Minutes), at 1.

At the time, the Board consisted of eight members: four designees of SBG and Vision Fund, including Claure (Executive Chairman of the Board) and Mathrani; the two members of the Special Committee; and Jeffrey Sine and John Zhao.[103] Skadden "recommended that an executive search firm be engaged to identify one to two disinterested and independent directors, who would then be considered for temporary appointment to the Board for the sole purpose of forming a new committee to consider the governance issues raised by the" Correspondence.[104] By a vote of 6-2, with one member of the Special Committee voting against and the other abstaining, the Board approved engaging Heidrick & Struggles, an executive search firm, "to identify two independent candidates to join the board of directors."[105]

At least five of the six directors who approved this resolution were conflicted, namely the four designees of SBG and Vision Fund and John Zhao.[106] The draft of the minutes for the April 29 Board meeting states that "Mr. Zhao, who also serves

---

[103] *Id.*; Berrent Dep. 37-38.

[104] Martin Decl. Ex. 10, at 2.

[105] *Id.* at 3; *see also* Will Decl. Ex. P (Email exchange between Robinson and Wilson Sonsini attorney David Berger).

[106] The Special Committee asserts that a sixth director, investment banker Jeff Sine, is beholden to SBG, which "is Sine's largest client." Compl. ¶ 58. According to the Complaint, Sine led SBG's negotiations of the MTA, acted as its "key" advisor in its acquisition of a controlling interest in Sprint, Inc., and negotiated for SBG when Sprint acquired T-Mobile, "the two largest deals that his firm ever advised on." *Id.*

as CEO of HONY Capital, asked that it be noted for the record that he is not independent in this context, because [of] HONY Capital's venture with SBG in China and that such venture is at the center of the [MTA] Litigation."[107] This statement was deleted from the final version of the minutes.[108] The same draft minutes note that "[m]anagement . . . emphasized that it has no view as to whether the decision not to complete the tender benefits or harms the Company."[109] This statement also was deleted from the final version of the minutes.[110]

On May 11, 2020, the Special Committee filed a motion for entry of a status quo order to prevent the Board from, among other things, forming a committee to review the authority of the Special Committee pending the court's decision on the motions to dismiss the Complaint.[111] On May 27, 2020, the court denied the motion for a status quo order "without prejudice to [the Special Committee's] ability to seek relief in the future depending on how the situation unfolds."[112] The court stated:

> Critically, if a new committee is appointed and if that committee reaches a conclusion that the special committee takes issue with, the special committee will be free at that time to challenge any action taken,

---

[107] Will Decl. Ex. O (Draft of April 29, 2020 Board Minutes), at 2.

[108] *Compare id.*, *with* Martin Decl. Ex. 10.

[109] Will Decl. Ex. O, at 3.

[110] *Compare id.*, *with* Martin Decl. Ex. 10.

[111] Proposed Order Maintaining the Status Quo (Dkt. 55).

[112] Mot. for Entry of a Status Quo Order Hr'g Tr. at 74 (May 27, 2020) (Dkt. 129).

at which point the Court would have a concrete set of facts with which to then consider the merits of any renewed application.[113]

On May 29, 2020, Heidrick & Struggles presented two candidates to the Board: Alex Dimitrief and Fred Arnold.[114] That same day, the Board, by a 6-2 vote with Dunlevie and Frankfort voting against, approved resolutions appointing Dimitrief and Arnold as directors and appointing them to a newly created committee (as defined above, the "New Committee").[115] The resolutions delegated to the New Committee the authority to make and implement certain determinations concerning the subject matter of the Correspondence, as follows:

> The Board resolves that the New Committee is hereby authorized to exercise all rights and powers of the Board to the fullest extent permitted by the Delaware General Corporation Law to (1) determine, in response to the Correspondence, whether the Special Committee has or should have, in the best interests of the Company and its stockholders, the authority to cause the Company to commence and/or continue the MTA Litigation or other litigation in the name of the Company involving the same or similar issues, and (2) to implement such a determination.[116]

The Board further resolved that it "desires to establish a specific term of the New Committee's existence" and determined that the New Committee would exist for a

---

[113] *Id.* at 73.

[114] Martin Decl. Ex. 14 (May 29, 2020 Board Minutes), at Skadden_NewCommittee 0000010.

[115] *Id.* at Skadden_NewCommittee 0000010; Martin Decl. Ex. 14, Annex Res-2 (May 29, 2020 Board Resolutions), at Skadden_NewCommittee 0000016.

[116] Martin Decl. Ex. 14, Annex Res-2, at Skadden_NewCommittee 0000016.

two-month term automatically expiring on July 29, 2020.[117]  Each member of the New Committee would receive $250,000 in compensation.[118]

On June 12, 2020, while the New Committee was conducting its investigation, SBG offered to make available to the Company the $1.1 billion in secured debt financing on the same terms that were included in the MTA.[119]  After negotiating "terms the Company believes are more favorable than those provided in the MTA," the Company "waiv[ed] the closing of the Tender Offer as a condition precedent."[120]

### J.  The New Committee's Investigation

On May 29, 2020, the New Committee began its investigation, which culminated in a 56-page report (as defined above, the "Report") that was delivered to the Board on July 28, 2020, the day before the New Committee disbanded.[121]  The New Committee was advised by the law firms of McDermott Will & Emery LLP and Selendy & Gay PLLC.[122]  With their assistance, the New Committee conducted at least 24 interviews and reviewed approximately 1,500 documents.[123]

---

[117] Martin Decl. Ex. 14, at Skadden_NewCommittee 0000010.

[118] *Id.*

[119] Report at 17.

[120] *Id.*

[121] *Id.* at 56.

[122] *Id.* at 23.

[123] *Id.* at 23-27.

As discussed later in this decision, the New Committee viewed its task to require that it answer the following three questions:

(1) *Did* the Special Committee have the authority, at the time that the MTA Litigation was filed, to initiate such litigation?

(2) *Does* the Special Committee have the authority today to continue to litigate the action it commenced on behalf of the Company?

(3) *Should* the Special Committee, in the best interests of the Company and its stockholders, have the authority on a going-forward basis to continue the MTA (or similar) Litigation?[124]

The Report concluded that the answer to each of these questions is no.

At the conclusion of the Report, the New Committee issued the following six directions to the Company:

*First*, the office of the General Counsel is to instruct the Company's counsel to file promptly a motion on behalf of the Company for leave to dismiss the MTA Litigation without prejudice pursuant to Court of Chancery Rule 41(a), appending to the motion a copy of this Report for the benefit of the Court.

\* \* \* \* \*

*Second*, the Company is to cooperate fully with reasonable discovery and information requests made by tendering stockholders who pursue litigation against SBG to enforce the Tender Offer or OTP, or to recover compensatory damages.

\* \* \* \* \*

---

[124] *Id.* at 27-28.

*Third*, subject to applicable privacy laws, the Company is to provide interested tendering stockholders and/or their counsel with contact information reasonably necessary to prosecute such litigation.

\* \* \* \* \*

*Fourth*, the Company should consider waiving its right to compel arbitration and its right to enforce (in whole or in part) any releases given by current or former employees against SBG and SBVF in employment or separation agreements, so as to enable current and former employees to participate in a class action litigation or themselves assert litigation in court to enforce the Tender Offer or recover damages for its failure.

\* \* \* \* \*

*Fifth*, we suggest that SBG and SBVF waive any claim under the MTA to indemnification of fees and costs in defending litigation asserted by the tendering stockholders to enforce the Tender Offer or seek damages from its failure.

\* \* \* \* \*

*Sixth*, we suggest that SBG and SBVF stipulate that the tendering stockholders may bring actions as third-party beneficiaries of the MTA so that they can base their claims on the MTA's "reasonable best efforts" clauses.[125]

On July 28, 2020, the New Committee acted by written consent to implement the first three directions.[126] The latter three directions are merely recommendations, none of which have been implemented to date.[127]  In connection with its

---

[125] *Id.* at 54-56 (bolded emphasis deleted).

[126] Martin Decl. Ex. 16 (July 28, 2020 Action by Unanimous Written Consent of the New Committee of the Board of Directors of The We Company).

[127] *See* Berrent Dep. 131-32.

32

investigation, the New Committee incurred over $7 million in fees and expenses as of September 30, 2020, all of which have been paid by WeWork.[128]

## II.    PROCEDURAL HISTORY

On July 30, 2020, WeWork, at the direction of management, filed a motion under Court of Chancery Rule 41(a) seeking leave to voluntarily dismiss the Complaint without prejudice.[129]  In response to this filing, the Special Committee sought discovery.  Management agreed to produce the two members of the New Committee for deposition but rejected the Special Committee's request for (i) privileged information relating to the circumstances under which the New Committee was established and (ii) three-hour depositions of Mathrani, Robinson, and Berrent.  On August 21, 2020, the court issued an opinion granting the Special Committee's request for this discovery.[130]

After expedited discovery and briefing, the court heard oral argument on October 16, 2020.[131]  The parties provided supplemental submissions thereafter.[132]

---

[128] Dkt. 410 (October 23, 2020 New Comm. letter to the court), at 4.

[129] Dkt. 204.

[130] *In re WeWork Litig.*, 2020 WL 4917593 (Del. Ch. Aug. 21, 2020).  The Special Committee did not seek any privileged communications between the New Committee and its counsel. *Id.* at *1.

[131] Dkt. 403.

[132] *See* Dkts. 410, 412, 420, 421.

During the pendency of the Rule 41(a) motion, the court has held in abeyance motions SBG and Vision Fund previously filed to dismiss the Special Committee's Complaint, in part, under Court of Chancery Rule 12(b)(6). On October 30, 2020, the court issued a memorandum opinion granting in part and denying in part SBG and Vision Fund's motion to dismiss the Neumann Complaint.[133] Simultaneously with this opinion, the court is issuing an opinion granting in part and denying in part SBG and Vision Fund's motion to dismiss the Special Committee's Complaint. In that opinion, the court concludes, among other things, that the Complaint stated a claim for breach of the MTA against Vision Fund but failed to state a claim for breach of fiduciary duty against SBG and Vision Fund.[134]

## III. ANALYSIS

The issue before the court is one of first impression: Should a temporary committee of a board of directors created in response to the filing of a lawsuit against the corporation's putative controlling stockholders (SBG and Vision Fund) be permitted to terminate the lawsuit, which an earlier committee of the board filed on behalf of the corporation with the support of the Company's management and its outside counsel to enforce the corporation's contractual rights against them?

---

[133] *See In re WeWork Litig.*, 2020 WL 6375438 (Del. Ch. Oct. 30, 2020).

[134] SBG did not seek dismissal of the contract claim asserted against it under Court of Chancery Rule 12(b)(6).

To be clear, the parties do not dispute that the Board, acting through the New Committee, has the legal authority to revoke powers that the Board granted the Special Committee in the first place. As this court has explained, "it is an elementary principle of corporate law that if a board has the power to adopt resolutions or policies, then it has the corresponding power to rescind them."[135] Consistent with this principle, the Special Committee states it "does not claim that its authority is 'irrevocable' or that the board may not validly remove a committee's authority."[136]

The novelty of the issue underlying the New Committee's motion is reflected in the parties' advancement of four different theories for what legal standard should govern the motion. Those theories span the full spectrum of judicial scrutiny. Relying on the venerable principle that "inequitable action does not become permissible simply because it is legally possible," the Special Committee argues that the New Committee's decision to revoke the Special Committee's authority should be nullified as inequitable under *Schnell v. Chris-Craft Indus., Inc.* and its progeny.[137] In the alternative, the Special Committee contends the court should

---

[135] *Perlegos v. Atmel Corp.*, 2007 WL 475453, at *26 (Del. Ch. Feb. 8, 2007) (internal quotation marks omitted).

[136] Special Comm. Opp'n Br. 24-25 (Dkt. 392).

[137] 285 A.2d 437, 439 (Del. 1971).

apply the entire fairness standard because it is "[t]he 'default' standard for reviewing the actions of a conflicted Board or those uniquely benefitting a controller."[138]

On the other side of the caption, the Company, acting at the direction of the New Committee, argues that the New Committee's determination that this action should be dismissed is "conclusive" because regardless of whether the Special Committee once had the authority to act for the Company in this litigation, "[t]he Board, acting through the New Committee, revoked that power."[139] The New Committee tempered this position modestly in its reply brief, suggesting that instead of being conclusive, its determination should be subject to "business judgment" review.[140] That standard, "which requires that [a] decision be approved if it can be attributed to any rational business purpose," equates to "something as close to non-review as our law contemplates."[141] As a fallback, the New Committee contends that "[i]f any standard of review were appropriate here, it should not be more

---

[138] Special Comm. Opp'n Br. 32.

[139] New Comm. Opening Br. 24 (Dkt. 372).

[140] *See* New Comm. Reply Br. 15 (Dkt. 396).

[141] *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013) (Strine, C); *see also Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of a waste test or tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780-81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

stringent than that applied to the conclusion of a *Zapata* committee to dismiss derivative litigation with prejudice."[142]

For the reasons discussed next, the court agrees that something akin to the standard our Supreme Court's articulated in *Zapata Corp. v. Maldonado,*[143] while designed to address a different scenario than present here, provides the best framework among those the parties identified for analyzing the New Committee's determination to seek dismissal of the Special Committee's complaint.

## A. Standard of Review

In *Zapata*, a stockholder sued ten officers and/or directors of Zapata Corporation for breaches of fiduciary duty.[144] Despite the fact that demand on the board was excused,[145] the board appointed two new outside directors to an "Independent Investigation Committee," which determined that the claims should be dismissed because "continued maintenance is inimical to the Company's best

---

[142] New Comm. Opening Br. 29.

[143] 430 A.2d 779 (Del. 1981).

[144] *Id.* at 780.

[145] *Id.* at 787 ("The context here is a suit against directors where demand on the board is excused.").

37

interests."[146]  After the Zapata Corporation moved to dismiss the action based on the committee's determination, the Court of Chancery denied the motion.[147]

In reversing the trial court, the Delaware Supreme Court framed the issue on appeal as follows:  "When, if at all, should an authorized board committee be permitted to cause litigation, properly initiated by a derivative stockholder in his own right, to be dismissed?"[148]  In answering this question, the high court recognized that the board had the authority under 8 *Del. C.* § 141(a) to create a committee to "rid itself of detrimental litigation" but also recognized "potentials for abuse" that use of the "committee mechanism" posed:[149]

> If, on the one hand, corporations can consistently wrest bona fide derivative actions away from well-meaning derivative plaintiffs through the use of the committee mechanism, the derivative suit will lose much, if not all, of its generally-recognized effectiveness as an intra-corporate means of policing boards of directors.  If, on the other hand, corporations are unable to rid themselves of meritless or harmful litigation and strike suits, the derivative action, created to benefit the corporation, will produce the opposite, unintended result.  It thus appears desirable to us to find a balancing point where bona fide stockholder power to bring corporate causes of action cannot be unfairly trampled on by the board of directors, but the corporation can rid itself of detrimental litigation.[150]

---

[146] *Id.* at 781.

[147] *Id.*  In a companion action in the United States District Court for the Southern District of New York, where Zapata moved for summary judgment based on the Independent Investigation Committee's determination, the district court granted the motion.  *Id.*

[148] *Id.* at 785.

[149] *Id.*

[150] *Id.* at 786-87 (internal citations omitted).

The "balancing point" the Supreme Court struck is a two-part test. In the first step, the corporation bears "the burden of proving independence, good faith and a reasonable investigation" and if the court "determines either that the committee is not independent or has not shown reasonable bases for its conclusions, or, . . . is not satisfied for other reasons relating to the process," the court "shall deny the corporation's motion."[151] Even if the first step is satisfied, the court may proceed "in its discretion" to the second step and "determine, applying its own independent business judgment, whether the motion should be granted."[152]

There are important differences between this case and the scenario that gave rise to the *Zapata* standard. The focus of the *Zapata* standard is whether an independent committee of the board should be permitted to dismiss with prejudice derivative claims asserted by a stockholder—typically for breach of fiduciary duty— seeking a recovery for the corporation in a "demand excused" situation, meaning that the claims would survive a Rule 23.1 motion for failure to make a demand.[153]

---

[151] *Id.* at 788-89.

[152] *Id.* at 789.

[153] See, e.g., *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 834-35 (Del. 2011); *London v. Tyrrell*, 2010 WL 877528, at *11 (Del. Ch. Mar. 11, 2010); *Norfolk Cty. Ret. Sys. v. Jos. A. Bank Clothiers, Inc.*, 2009 WL 353746, at *7 & n.52 (Del. Ch. Feb. 12, 2009), *aff'd*, 977 A.2d 899 (Del. 2009); *Sutherland v. Sutherland*, 958 A.2d 235, 237-38 (Del. Ch. 2008) (Lamb, V.C.); *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 939-40 (Del. Ch. 2003) (Strine, V.C.); *Katell v. Morgan Stanley Grp., Inc.*, 1993 WL 205033, at *1-2 (Del. Ch. June 8, 1993); *Spiegel v. Buntrock*, 1988 WL 124324, at *2-4 (Del. Ch. Nov. 17, 1988), *aff'd* 571 A.2d 767 (Del. 1990); *Kaplan v. Wyatt*, 484 A.2d 501, 504-506 (Del. Ch. 1984), *aff'd*, 499 A.2d 1184 (Del. 1985).

Here, by contrast, the New Committee seeks to dismiss a viable direct claim for breach of contract that the Company, at the direction of the Special Committee, has asserted against SBG and Vision Fund seeking specific performance to require SBG to pay stockholders for the shares they tendered in the Tender Offer.[154] In other words, the proponent of the claim (a stockholder versus a board committee), the nature of the claim (breach of fiduciary duty versus breach of contract), and the recipient of any monetary recovery (the corporation versus a subset of stockholders) are all different. [155]

Notwithstanding these differences, the common denominator between this case and the *Zapata* scenario is the use a fully-authorized board committee to determine whether viable claims of the corporation should be dismissed.[156] The

---

[154] The viability of the Special Committee's claim that SBG and Vision Fund breached the reasonable best efforts provisions of the MTA is evidenced by the fact that SBG did not seek to dismiss the claim at the pleadings stage and the court has denied Vision Fund's motions to dismiss the same claim asserted against it under Court of Chancery Rule 12(b)(6) by Neumann and, in an opinion issued today, by the Special Committee. *See* Dkt. 84 (Br. in Supp. of SBG's Mot. to Dismiss Compl.); *In re WeWork Litig.*, 2020 WL 6375438, at *9 ("Accepting as true the well-pled allegations of the Complaint and drawing all reasonable inferences in Plaintiffs' favor, as the court must at this stage, Count II states a reasonably conceivable claim that Vision Fund breached its reasonable best efforts obligations in Sections 8.03(a), 8.09, and 8.12 of the MTA.").

[155] The *Zapata* scenario and this case also differ in that a *Zapata* dismissal is with prejudice so as to preclude further litigation of the derivative claims whereas the New Committee's motion seeks to dismiss the Special Committee's Complaint "without prejudice to preserve the Company's options in the event that circumstances change in the future such that resurrecting the claims in the MTA Litigation would best serve the interests of the Company and all its stockholders." Report at 54.

[156] *See Zapata*, 430 A.2d at 786-87.

40

potential for abuse in using the "committee mechanism" for this purpose was the impetus for creating the two-step *Zapata* test. As the Supreme Court explained in *Zapata*, "there is sufficient risk in the realities of a situation like [this] to justify caution beyond adherence to a theory of business judgment."[157] Given that the realities underlying creation of the *Zapata* standard are equally present in this case— *i.e.*, the presence of a conflicted Board and of putatively controlling stockholders (SBG and Vision Fund) who are defendants in the underlying litigation and who have made known to the Board their desire to have the litigation dismissed—it would be inappropriate in my view to accept the New Committee's determination as conclusive or to review its dismissal motion under the highly deferential business judgment rule. Rather, these realities support applying a higher level of scrutiny along the lines of the *Zapata* standard.

Turning to the two standards of review the Special Committee has proposed, the court is not persuaded that either standard fits the circumstances of this case as well as the *Zapata* standard. The Special Committee cited no authority in which a director (as opposed to a stockholder) was found to have standing to invoke equitable review of a legally permissible action under *Schnell* and its progeny to challenge the

---

[157] *Id.* at 787; *see also In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013) ("Enhanced scrutiny applies to specific, recurring, and readily identifiable situations involving *potential* conflicts of interests where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." (emphasis added)).

41

action of other directors.[158]  And as a leading treatise explains, our "case law is indicative of a healthy inclination on the part of the judiciary to employ the *Schnell* principle of 'legal but inequitable' only sparingly," and typically does so only when "inequitable conduct has occurred but is not plainly remediable under conventional fiduciary doctrines."[159]  Here, *Zapata* articulates a standard that is more appropriately tailored to address the actions of a board committee formed to consider whether or not a viable corporate claim should be dismissed.

At first blush, there is some appeal to the Special Committee's fallback position to apply the entire fairness standard, which Delaware courts routinely apply

---

[158] When pressed on the issue, the only authority the Special Committee identified for support was this court's decision in *In re CBS Corp. Litig.*, 2018 WL 3414163 (Del. Ch. July 13, 2018).  Mot. for Leave to Dismiss Compl. Pursuant to Court of Chancery Rule 41(a) Hr'g Tr. at 54-58, 87 (Oct. 16, 2020) (Dkt. 433).  *CBS* did involve a special committee, but the court never considered whether the committee had standing to assert a claim under *Schnell* and its progeny.

[159] 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 4.03, at 13 (2019); *see also STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1137 n.2 (Del. 1991) ("Again, we emphasize that our courts must act with caution and restraint when granting equitable relief in derogation of established principles of corporate law."); *Alabama By-Products Corp. v. Neal*, 588 A.2d 255, 258 n.1 (Del. 1991) ("While the doctrine of [*Schnell*], is an important part of our jurisprudence, its application, or that of similar concepts, should be reserved for those instances that threaten the fabric of the law, or which by an improper manipulation of the law, would deprive a person of a clear right."); *Dolgoff v. Projectavision, Inc.*, 1996 WL 91945, at *7 (Del. Ch. Feb. 29, 1996) (Allen, C.) ("But such equitable power obviously must be invoked sparingly and only when circumstances make relatively clear that inequitable behavior or manipulation is present."); Leo E. Strine, Jr., *If Corporate Action Is Lawful, Presumably There Are Circumstances in Which It Is Equitable to Take That Action: The Implicit Corollary to the Rule of* Schnell v. Chris–Craft, 60 Bus. Law. 877, 893 n.68 (2005) ("*Schnell's* tradition cautions against a literal reading of the quoted language, which is better read as manifesting a recognition that equity should not lightly impede actions authorized by law.").

to actions taken by a controlling stockholder or a conflicted board of directors. Once again, however, the *Zapata* standard seems like the better fit given that the action to be reviewed—dismissal of this action under Court of Chancery Rule 41(a)—is based on the determination of a committee that was "authorized to exercise all rights and powers of the Board to the fullest extent permitted by the Delaware General Corporation Law" with respect to this issue.[160]

For these reasons, the court concludes that the appropriate standard of review to apply to the Rule 41(a) dismissal motion is a form of the two-step *Zapata* test.

## B.     The First Prong of the *Zapata* Test

"The first prong of the *Zapata* standard analyzes the independence and good faith of committee members, the quality of its investigation and the reasonableness of its conclusions."[161] The New Committee "is not entitled to any presumptions of independence, good faith, or reasonableness."[162] "Rather, the corporation has the burden of proof under Rule 56 standards, which require the corporation to establish the absence of any material issue of fact and its entitlement to relief as a matter of law."[163] "The motion must be supported by a thorough written record."[164]

---

[160] Martin Decl. Ex. 14, Annex Res-2, at Skadden_NewCommittee 0000016.

[161] *Kahn*, 23 A.3d at 836.

[162] *Sutherland*, 958 A.2d at 239.

[163] *Id.*

[164] *Kaplan*, 484 A.2d at 506.

### 1.    Independence

The independence of the two members of the New Committee is unchallenged.  No evidence has been provided that either of them have a personal interest in the outcome of this litigation or that they are beholden to anyone who does, including SBG and Vision Fund.  Nor has any evidence been provided calling into question the independence of the New Committee's legal advisors.

The record also reflects that Dimitrief and Arnold were qualified to serve on the New Committee.  Dimitrief was a litigation partner at Kirkland & Ellis LLP for over twenty years, served in senior positions at General Electric, has served on corporate boards, and currently is a partner at a legal consulting firm.[165]  Arnold is a retired financial professional with a background in investment banking, has served in senior operating positions at troubled private equity-owned portfolio companies, and has served as a corporate executive and director at multiple companies.[166]

### 2.    Good Faith and Reasonable Investigation

Notwithstanding the independence of the New Committee's members, there are significant shortcomings and errors in the New Committee's report that undermine the court's confidence in the reasonableness of its investigation and a number of its conclusions.  Before turning to those issues, it bears emphasis what

---

[165] Report at 21.

[166] *Id.*

the Report does not do. Unlike a typical *Zapata* special litigation committee, the New Committee did not investigate the factual allegations of the Special Committee's Complaint and offers no opinion on the merits of the Company's claims against SBG and Vision Fund.[167] Instead, the New Committee's Report is devoted to a narrow issue: "whether it is in the best interests of the Company and its stockholders for the Special Committee to pursue its claims as a lawsuit by the Company at the Company's expense."[168]

As previously explained, the New Committee tackled this assignment by answering in the negative the following three questions:

> (1) *Did* the Special Committee have the authority, at the time that the MTA Litigation was filed, to initiate such litigation?
>
> (2) *Does* the Special Committee have the authority today to continue to litigate the action it commenced on behalf of the Company?
>
> (3) *Should* the Special Committee, in the best interests of the Company and its stockholders, have the authority on a going-forward basis to continue the MTA (or similar) Litigation?[169]

The court addresses it concerns with the reasonableness of the New Committee's investigation with respect to these three issues, in turn, next.

---

[167] *Id.* at 2 ("Our purpose is *not* to second-guess or decide the merits of the claims asserted by the Special Committee regarding the failed Tender Offer."); *see also id.* at 32 ("We have not aspired to conduct a *Zapata*-like assessment of the merits of the MTA Litigation.").

[168] *Id.* at 32.

[169] *Id.* at 27-28.

### a. The "Did" Question

The New Committee's conclusion that the Special Committee did not have the authority to file the MTA Litigation when it did is based primarily on its subsidiary conclusions that the MTA Litigation was not authorized under the Resolutions or the MTA.[170]

Starting with the Resolutions, the New Committee correctly observes that the Resolutions "do not expressly delegate litigation authority over the MTA or any Potential Transaction to the Special Committee."[171] The New Committee then goes on to analyze what it characterizes as the "catch-all" provision in the October 12, 2019 Resolutions.[172] That provision appears in the fourth paragraph of the excerpt from the October 12, 2019 Resolutions quoted below:

> The Board therefore resolves that the Special Committee is hereby formed and the Bruce Dunlevie and Lewis Frankfort are hereby designated as the members of the Special Committee, with Bruce Dunlevie to serve as the Chairperson of the Special Committee.

---

[170] *See id.* at 33-35. The Report also concludes that the Special Committee did not have the authority to bring a claim for breach of fiduciary duty against SBG and Vision Fund and, even if it did, that such a claim should not proceed for various reasons. *See id.* at 37, 45-47. This issue is moot because the court grants SBG and Vision Fund's motions to dismiss Count II of the Complaint, which asserted breach of fiduciary duty claims against SBG and Vision Fund, for the reasons explained in a decision issued concurrently with this opinion.

[171] *Id.* at 33.

[172] *See id.* at 34.

The Board further resolves that the Special Committee is hereby authorized to review, evaluate and assist in the structuring of a Potential Transaction (including the possibility of not permitting a Potential Transaction to proceed at this point in time) and to make any and all determinations and recommendations regarding a Potential Transaction that the Special Committee deems appropriate, including a determination or recommendation whether the final terms of any Potential Transaction are in the best interests of the stockholders of the Company (other than any interested stockholders of the Company), and the Special Committee shall provide periodic updates to the Board in this regard, where appropriate to do so.

The Board further resolves that it shall not adopt or approve the consummation of any Potential Transaction without such a determination or recommendation by the Special Committee of the final terms of such Potential Transaction, but a determination or recommendation by the Special Committee to adopt or approve the consummation of a Potential Transaction shall be subject to approval by the Board and, if required by law or regulation, by the Company's stockholders.

The Board further resolves that, subject to the foregoing (including the requirement of Board approval prior to execution of any definitive agreements relating to a Potential Transaction), the Special Committee is hereby authorized to exercise all rights and powers of the Board to the fullest extent permitted by the Delaware General Corporation Law in connection with a Potential Transaction, including for purposes of Section 2.01 of the Company's Stockholders' Agreement the power and authority to authorize the issuance of equity securities of the Company.[173]

The Report explains that the Special Committee relies heavily on the "catch-all" provision in the October 12, 2019 Resolutions as the source of its authority to

---

[173] Martin Decl. Ex. 2, Annex A.

initiate the MTA Litigation.[174]  The New Committee found there was "a textual flaw in" the Special Committee's reliance on this provision because "[t]he catch-all provision was expressly made 'subject to the foregoing,' including the articulation that the Special Committee's express charge was to 'review, evaluate, and assist in the structuring of a Potential Transaction.'"[175]  The Report asserts "that the more reasonable reading of" this provision is that it merely "gave the Special Committee 'all rights and powers' to 'review, evaluate, and assist in the structuring of a Potential Transaction' and then 'adopt and approve' it, not to sue to enforce it outside of a Company's regular processes for such litigation."[176]  This analysis is incorrect in my opinion for three reasons.

First, given that the second paragraph of the excerpt of the October 12, 2019 Resolutions quoted above authorizes the Special Committee not only "to review, evaluate and assist in the structuring of a Potential Transaction," but "*to make any and all determinations and recommendations regarding a Potential Transaction that the Special Committee deems appropriate*," it is not apparent what independent effect the "catch-all" provision would have under the New Committee's interpretation.[177]  Put differently, the interpretation proffered in the Report appears

---

[174] Report at 34.

[175] *Id.* (quoting October 12, 2019 Resolutions).

[176] *Id.* (quoting October 12, 2019 Resolutions).

[177] Martin Decl. Ex. 2, Annex A (emphasis added).

to render the authorization of "rights and powers" in the "catch-all" provision mere surplusage, contrary to basic principles of contract interpretation, since earlier parts of the October 12, 2019 Resolutions already authorized the Special Committee to make any determination concerning a Potential Transaction.[178]

Second, and most importantly, the more reasonable interpretation of the plain language of the Resolutions is that the "subject to the foregoing" qualification referred to the limitations in the paragraph of the October 12, 2019 Resolutions immediately preceding the "catch-all" provision, *i.e.*, that (i) a determination by the Special Committee to adopt or approve the consummation of a Potential Transaction would be subject to Board approval and (ii) the Board would not adopt or approve the consummation of a Potential Transaction without a recommendation from the Special Committee. This interpretation is supported by the fact that (i) the parenthetical immediately following the "subject to the foregoing" qualification— which plainly is intended to illustrate the meaning of the qualification—expressly references the Board approval requirement and (ii) the October 13, 2019 Resolutions removed the "subject to the foregoing" limitation at the same time the Board approval requirement was eliminated:

---

[178] *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010) ("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").

49

*The Special Committee is empowered to adopt and approve the consummation of any Potential Transaction* (as defined in the October 12, 2019 resolutions of the Board), if the Special Committee deems a Potential Transaction to be advisable and in the best interests of the Company and its stockholders (other than any interested stockholders of the Company), *and no such determination or recommendation by the Special Committee to adopt or approve the consummation of a Potential Transaction shall require further approval by the Board* or the Company's stockholders *except to the extent required by law or regulation.* **In furtherance of the foregoing**, the Special Committee is hereby authorized to exercise all rights and powers of the Board to the fullest extent permitted by the Delaware General Corporation Law in connection with a Potential Transaction.[179]

Importantly, as restated in the last sentence of the October 13, 2019 Resolutions, the "catch-all" provision begins with the phrase "[i]n furtherance of the foregoing." This language—unlike the phrase "subject to the foregoing" and contrary to the New Committee's reading[180]—is not a form of limitation.

Delaware courts look to dictionaries when assessing the plain meaning of terms.[181] *Black's Law Dictionary* defines the term "furtherance" to mean "[t]he act or process of facilitating the progress of something or making it more likely to occur;

---

[179] Martin Decl. Ex. 3, at 2 (emphasis added).

[180] Report at 34.

[181] *In re Solera Ins. Coverage Appeals*, 2020 WL 6280593, at *9 (Del. Oct. 23, 2020) ("This Court often looks to dictionaries to ascertain a term's plain meaning."); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

promotion or advancement."[182]   Other dictionaries are to the same effect.[183]

Consistent with this definition, the plain language of the Resolutions in their final, revised form delegated to the Special Committee the authority to adopt and approve the consummation of a Potential Transaction unilaterally (unless Board approval was required by "law or regulation") along with the *further* authority "to exercise all rights and powers of the Board to the fullest extent permitted by the Delaware General Corporation Law in connection with a Potential Transaction."[184]  The latter phrase logically would include the Board's statutory authority to pursue litigation on behalf of the Company in connection with a "Potential Transaction."[185]  As noted above, that term is defined in the Resolutions to include the proposal that ultimately was documented in the MTA, which included "a tender offer by SoftBank for Company equity."[186]  Thus, in my opinion, the more reasonable interpretation of the

---

[182] *Black's Law Dictionary* (11th ed. 2019).

[183] *Webster's Third New International Dictionary* 924 (1976) (defining "furtherance" as "a helping forward: advancement, promotion"); *Furtherance*, Dictionary.com, https://www.dictionary.com/browse/furtherance?s=t (last visited Dec. 14, 2020) ("the act of furthering; promotion; advancement.").

[184] Martin Decl. Ex. 3, at 2.

[185] *Zapata*, 430 A.2d at 782 ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C*. § 141(a)."); *Spiegel*, 571 A.2d at 773 ("The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation.").

[186] Martin Decl. Ex. 2, Annex A.

51

plain language of the Resolutions is that the Special Committee did have the authority to file the MTA Litigation when it did.

Third, to the extent reasonable minds could differ as to whether the Resolutions authorized the Special Committee to file litigation to enforce the provisions of the MTA, the evidence before the court uniformly supports the conclusion that it did. The Report, however, considers very little of this evidence. This is troubling because the necessary implication of the Report's analysis—which refers to the New Committee's interpretation as the "the *more* reasonable reading" of the "catch-all" provision[187]—is that the New Committee itself viewed the "catch-all" provision to be susceptible to more than one reasonable interpretation, meaning that the provision is ambiguous.[188] To resolve the ambiguity, the Report should have analyzed all relevant extrinsic evidence:

> If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealing between the parties, [and] business custom and usage in the industry.[189]

---

[187] Report at 34 (emphasis added).

[188] *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 287 (Del. 2001) (holding that a contract is "ambiguous when the provisions in controversy are reasonably or fairly susceptible to different interpretations or may have two or more different meanings").

[189] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)); *see also Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) ("In construing an

52

The extrinsic evidence before the court, some of which was developed in discovery in response to the Rule 41(a) motion, uniformly supports that the Resolutions were intended to authorize the Special Committee to file litigation to enforce the provisions of the MTA, including:

- The October 22, 2019 email from a Skadden partner advising a Board observer shortly before the MTA was executed that "[t]he "Special Committee, acting through the Company, has the ability to sue for specific performance to cause SoftBank to do the tender offer."[190]

- The representation WeWork made to its stockholders in the Disclosure Statement that Frankfort would remain on the Board "until the later of (a) the completion of the SoftBank Transactions (*including the resolution of any litigation or disputes with SoftBank with respect to the SoftBank Transactions*) and (b) the consummation of the Tender Offer."[191]

- The provision in the Stockholders' Agreement that Frankfort would remain a director of WeWork until the later of the final resolution of "*any litigation or disputes . . . with SBG arising [from the MTA] (including with respect to the Tender Offer (as defined in the MTA))* or . . . the consummation of the Tender Offer."[192]

- The representation in the Offer to Purchase that mirrors the provisions in the Disclosure Statement and the Stockholders' Agreement quoted above.[193]

---

ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing.").

[190] Will Decl. Ex. G.

[191] Disclosure Statement at 2 (emphasis added).

[192] Stockholders' Agreement § 2.01(b)(iv) (emphasis added).

[193] Will Decl. Ex. A, at WeWork_00000432.

- The unequivocal statements and testimony of Robinson, the lead deal partner for the MTA transaction at Skadden, which drafted the Resolutions, that the Special Committee had the authority to pursue litigation to enforce the terms of the MTA under the Resolutions.[194]

- The fact that Robinson prompted the Special Committee to bring the lawsuit against SBG and Vision Fund on behalf the Company after WeWork signed a term sheet with Trustbridge concerning ChinaCo that allegedly was inconsistent with the terms contemplated in the MTA for completing the ChinaCo Roll-Up.[195]

- The testimony of Berrent, WeWork's Chief Legal Officer, that the Special Committee had the "full authority to handle how to respond to SoftBank with respect to issues arising out of the MTA."[196]

- The fact that Skadden and Berrent participated, subject to a common interest privilege, in reviewing drafts of the complaint to be filed by the Company at the direction of the Special Committee to assert claims against SBG and Vision Fund for breach of the MTA.[197]

It is unclear from the Report how much of this evidence the New Committee marshaled during its investigation. What is clear is that, with one exception, the Report did not analyze any of this evidence in reaching its conclusion concerning the meaning of the Resolutions.[198]

---

[194] Will Decl. Ex. F, at 3; Robinson Dep. 61.

[195] *See supra* Part. I.F.

[196] Berrent Dep. 58-59.

[197] *See supra* Part. I.F.

[198] The Report does note that the New Committee reviewed drafts of the MTA, which "reveal no material negotiations about the condition precedent to closing the Tender Offer." Report at 27.

54

The one piece of extrinsic evidence the Special Committee considered in the Report, which is discussed in a footnote, is the representation SBG made to the minority stockholders in the Disclosure Statement "that Mr. Frankfort would retain his Board seat until the later of 'the SoftBank transactions (including the resolution of any litigation or disputes with SoftBank with respect to the [the MTA])' and 'the consummation of the Tender Offer.'"[199]  Quoting Section 11.14 of the MTA, the Report contends that "[t]he Special Committee reads too much into" this disclosure because the MTA only grants it the "power to 'approve' 'any action or determination by the Company to exercise rights or enforce remedies against SBG under [the MTA].'"[200]  As discussed next, however, Section 11.14 did not preclude the Special Committee from initiating litigation against SBG to enforce remedies under the MTA.  Thus, the Report's disregard of the representation in the Disclosure Statement relied on a flawed understanding of Section 11.14.

> Section 11.14 of the MTA states in relevant part, that:
>
> Following the occurrence of the Board Change and until the later of the consummation of the Debt Financing and the Tender Offer, . . . any action or determination by the Company to exercise rights or enforce remedies against SBG under this Agreement shall require the approval of the Special Committee . . . .[201]

---

[199] *Id*. at 35 n.156 (quoting Disclosure Statement at 2).

[200] *Id.* (quoting MTA § 11.14).

[201] MTA § 11.14.

The Report concludes that this provision "does not grant the Special Committee authority to sue on the Company's behalf."[202] The Report goes on to explain that the New Committee "read[s] Section 11.14 to say that the Company (*e.g.*, management) can propose to bring suit, but cannot do so without the Special Committee's approval."[203] The Report does not discuss who else could propose under Section 11.14 that the Company bring a suit against SBG, implying that "management" has the exclusive authority to enforce remedies against SBG under the MTA during the period covered by Section 11.14, *i.e.*, after the "Board Change" and until the consummation of both the Debt Financing and the Tender Offer. The court disagrees with this interpretation.

Although Section 11.14 does not expressly grant the Special Committee the authority to sue on the Company's behalf, neither does that provision preclude the Special Committee from doing so. Indeed, Section 11.14 does not purport to delegate the Company's authority to exercise rights or enforce remedies against SBG under the MTA *to anyone*. It merely provides that no one purporting to act on behalf of the Company may enforce remedies against SBG under the MTA during the relevant period without obtaining the Special Committee's approval. A lawsuit filed by the Company *at the direction of the Special Committee pursuant to its authority*

---

[202] Report at 35.

[203] *Id.*

56

*under the Resolutions* to enforce remedies against SBG under the MTA necessarily would have been approved by the Special Committee and thus would comply with Section 11.14.

Even assuming that the New Committee's interpretation of Section 11.14 was correct, which it is not in the court's judgment, the Report suffers from another failing. Having determined that "management" could propose to bring a suit against SBG under Section 11.14, it was incumbent on the New Committee to determine if it had done so. The record developed on this motion provides strong evidence that management, in fact, encouraged the Special Committee to file suit against SBG (as well as Vision Fund) on behalf of the Company to enforce its remedies under the MTA. Specifically:

- Berrent and WeWork's outside counsel (Skadden) became concerned that SBG was violating the MTA by failing to use its reasonable best efforts to complete the ChinaCo Roll-Up.[204]

- Thereafter, on March 16, 2020, Robinson of Skadden, in an email to the Special Committee's counsel (Wilson Sonsini), encouraged the Special Committee "to make a decision soon about whether it will bring a lawsuit against Softbank on behalf of the company."[205]

- Skadden and Berrent subsequently reviewed and commented on drafts of the complaint to be filed by the Company at the direction of the Special Committee, asserting, among other things, that SBG and Vision Fund breached their obligations under the MTA to complete the ChinaCo Roll-Up and to consummate the Tender Offer

---

[204] *See* Berrent Dep. 136, 139-40; Robinson Dep. 43-44.

[205] Will Decl. Ex. I.

and seeking the remedy of specific performance.[206]  Skadden specifically suggested that the Special Committee's draft complaint should "express[] more outrage over SoftBank's actions in frustrating the ChinaCo condition."[207]

It is inexplicable that the New Committee, having determined that management could propose that the Company bring a lawsuit against SBG under Section 11.14 of the MTA, did not analyze whether management effectively made such a proposal through the Special Committee before reaching the conclusion that the Special Committee was not authorized to file the MTA Litigation.  Had it done such an analysis, the New Committee would have been presented with facts indicating management encouraged the Special Committee to take action and approved of the filing of the Complaint.[208]

\* \* \* \* \*

In sum, in determining whether the Special Committee had the authority to file the MTA Litigation, the New Committee reached the wrong legal conclusion in

---

[206] *See* Will Decl. Ex. K, at DNP000949; Will Decl. Ex. L.

[207] Will Decl. Ex. K, at DNP000949.

[208] The New Committee contends in its December 10, 2020 letter to the court that the minutes of a Special Committee on March 24, 2020 contradict the Special Committee's assertion that Mathrani never "objected" to the MTA Litigation before Berrent's call with Townsend in mid-April.  *See* Dkt. 504.  The court does not see the contradiction.  The minutes do not indicate that Mathrani *objected* to the filing of the MTA Litigation.  Rather, they state that the Special Committee "reported that Mr. Mathrani expressed concerns that litigation related to the tender offer *could have* adverse consequences."  Dkt. 504 Ex. A (emphasis added).  It strains credulity, furthermore, to suggest that the Company's Chief Legal Officer and outside counsel would encourage and assist in the filing of the MTA Litigation over the objection of the Company's CEO.

my opinion by misinterpreting the Resolutions and Section 11.14 of the MTA. With respect to the Resolutions, moreover, the Special Committee failed to consider extrinsic evidence even though the New Committee itself seemingly found the Resolutions to be ambiguous.

### b. The "Does" Question

The second question the New Committee answered in the Report was "[e]ven if the Special Committee had authority to bring the MTA Litigation as of when the MTA was being negotiated and/or executed, does the Special Committee continue to have the authority to maintain this Litigation today?"[209] In concluding that the answer to this question is no, the New Committee found that "[t]he Special Committee is no longer sufficiently disinterested to fulfill its mandate to act in the best interests of the Company and its stockholders (except those affiliated with Mr. Neumann and SBG)."[210]

The Report premised this finding on the fact that circumstances changed after the MTA Litigation was filed in April 2020 because the Company has now "received all the benefits to which the Company was entitled under the MTA."[211] These "benefits" to which the Report refers consist of the three components of the $5.05

---

[209] Report at 37.

[210] *Id.*

[211] *Id.* at 38.

59

billion of Debt Financing set forth in the MTA.[212] SoftBank provided two of these components before this action was filed,[213] but had not provided the third component (*i.e.*, $1.1 billion of secured debt financing) as of that date. At the outset of this action, the Special Committee asserted, justifiably, that requiring SBG to complete the Tender Offer would benefit the Company by triggering SBG's obligation to provide the secured debt financing.[214] It was only in June 2020, after this action was filed—and perhaps due to its filing—that SBG offered to make the secured debt financing available to the Company.[215]

The change of circumstances concerning the Debt Financing was facilitated by Amendment No. 1 to the MTA. It allowed the Debt Financing to occur either before or after the Tender Offer closed whereas the original terms of the MTA required that the Tender Offer close before the Debt Financing could commence.[216] Neumann has advanced a viable claim against SBG and Vision Fund that they

---

[212] *See* MTA § 4.01(a)-(b).

[213] *See* Dkt. 14, at 4.

[214] *See* Compl. ¶¶ 21, 87; Dkt. 28 (Special Comm.'s Reply in Further Support of its Mot. for Expedited Proceedings) ¶ 16; Dkt. 132 (Special Comm.'s Answering Br. in Opp'n to Defs.' Mot. to Dismiss Compl.), at 42.

[215] Report at 17.

[216] Amendment No. 1 § 3.

breached the MTA by obtaining this amendment without Neumann's consent as a signatory to the MTA.[217]

Significantly, the Special Committee never asserted a claim for breach based on Amendment No. 1 and it has not been suggested that either of its members has impeded the Company in any way from receiving any of the benefits of the Debt Financing.[218] Given the absence of any indication that the Special Committee members failed to advance the Company's best interests with respect to the Debt Financing, it comes with ill grace to contend the that Special Committee is no longer "sufficiently disinterested" simply because the Company has now received all of the benefits of the Debt Financing.

The New Committee contends that "[g]enerally speaking, directors cannot devote corporate resources for the exclusive benefit, or to vindicate the special rights, of a particular subset of stockholders."[219] None of the authorities the Report cites for this proposition involve the issue here: the use of corporate funds to pay advisors of a board committee that the corporation is obligated to pay.[220] Here, the

---

[217] SBG did not seek to dismiss this claim, conceding its viability. Vision Fund did seek to dismiss the claim under Court of Chancery Rule 12(b)(6), but the court denied that motion. *See In re WeWork Litig.*, 2020 WL 6375438, at *9-11.

[218] *See* Compl. ¶¶ 89-98.

[219] Report at 39.

[220] *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *1, *39 (Del. Ch. Apr. 14, 2017), *as corrected* (Apr. 24, 2017) (denying motion to dismiss fiduciary duty claim against certain directors because "[t]he Complaint's detailed factual allegations

61

Resolutions and the MTA both require that the Company pay for the fees and expenses of the Special Committee's advisors.[221] The relevant question in the New Committee's "Does" analysis to my mind is whether the MTA Litigation must be dismissed now that the issues concerning the Debt Financing are off the table simply because Dunlevie and Frankfort stand to benefit personally if SBG is required to close the Tender Offer and the Company pays for the litigation to secure that outcome.

Importantly, it was entirely foreseeable when the Board approved the Resolutions to form the Special Committee that Dunlevie and Frankfort would

---

support a reasonable inference that the individual defendants acted in bad faith to benefit" a venture capital firm "by maximizing the value of its contractual redemption right" "over the undifferentiated equity" of the corporation); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *36 (Del. Ch. Sept. 4, 2014) (finding unfair process in an entire fairness analysis due to "[t]he Board's utter failure to understand" that it "owe[s] fiduciary duties to all stockholders"), *aff'd sub nom. Fuchs v. Wren Hldgs., LLC*, 129 A.3d 882 (Del. 2015); *Gilbert v. El Paso Co.*, 1988 WL 124325, at *10 (Del. Ch. Nov. 21, 1988) (granting summary judgment and dismissing duty of loyalty claims against directors because "[t]here is no direct evidence that the directors were motivated by selfish concerns"), *aff'd*, 575 A.2d 1131 (Del. 1990).

[221] Martin Decl. Ex. 2, Annex A ("The Board further resolves that the Special Committee is hereby authorized to . . . enter into such arrangements providing for the retention, compensation, [and] reimbursement of expenses . . . of such advisors as the Special Committee determines to be advisable, thereby obligating the Company to pay all fees, expenses and disbursements and to honor all other obligations of the Company under such contracts."); MTA § 11.14 ("Following the occurrence of the Board Change and until the later of the consummation of the Debt Financing and the Tender Offer . . . the Company shall pay, on behalf of the Special Committee, for any reasonable and documented fees and expenses of professional advisors or other representatives of the Company.").

participate in the Tender Offer.[222] And the extrinsic evidence discussed above suggests the parties to the MTA contemplated that the Special Committee, which was entitled to have the Company pay for its advisors, would be responsible for litigating on behalf of the Company any disputes against SBG that might arise concerning the transactions in the MTA, including the Tender Offer. Thus, the record supports a reasonable inference it was "baked into the deal" that Dunlevie and Frankfort could press claims on behalf of the Company and at its expense to enforce SBG's obligation to complete the Tender Offer even though they stood to benefit from tendering shares in the Tender Offer.[223] The New Committee, however, did not consider this possibility in its Report, presumably because it concluded, without a reasonable basis in my view, that the Special Committee was not authorized to file the MTA Litigation in the first place.

### c. The "Should" Question

The third question the New Committee addressed is "whether it is in the best interests of the Company and all its stockholders for the Special Committee to have the authority to continue to prosecute these claims."[224] In answering this question in

---

[222] *See* Robinson Dep. 17-19.

[223] Another potential litigation expense baked into the deal was that the Company would indemnify SBG for its attorneys' fees and expenses if it were to prevail in a litigation accusing it of breaching its obligations under the MTA. *See* MTA § 11.02(b).

[224] Report at 40.

the negative, the Report concluded "that the limited and/or intangible benefits the Company could receive from the MTA Litigation are readily outweighed by the very real harms the Company has and will continue to suffer."[225] The court considers next key aspects of the Report's analysis of the benefits versus the harms.

On the "benefits" side of the equation, the Report acknowledges that the Tender Offer would provide tendering stockholders "a significant premium to current equity value."[226] The Report also recognizes that closing the Tender Offer would benefit 244 employees of the Company who stand to receive approximately $39.8 million if the Tender Offer is completed and could provide a benefit to the Company, albeit a "relatively small" benefit, in the form of improved employee morale and retention.[227] The Report concludes, however, that the harm to employee morale and retention from not completing the Tender Offer is not "significant enough" to warrant proceeding with the MTA litigation given the harms to the Company of doing so and given "that the Company can address morale and retention issues in a more efficient, targeted fashion than the MTA Litigation."[228] To that end, the Report comments that "[m]anagement could easily address any dissatisfaction among this group through other means of compensation awards" and that this

---

[225] *Id.*

[226] *Id.*

[227] *Id.* at 42-43.

[228] *Id.*

approach would be "less damaging than pursuing the Litigation."[229] But the Report provides no quantification to support those assertions and it is far from clear that the cost of providing additional compensation to employees in lieu of allowing them to receive a total of $39.8 million for some of their WeWork shares would be less than the cost of pressing the MTA Litigation for the benefit of all stockholders who tendered shares.

More broadly, the Report concludes that "completion of the Tender Offer cannot be viewed as a significant benefit" to the Company because it "would receive none of [the] proceeds."[230] In reaching this conclusion, the Report does not consider that WeWork and all of its stockholders may benefit from closing the Tender Offer by increasing SBG's "skin in the game." The MTA contemplates that SBG would invest a total of approximately $9.5 billion in WeWork, $3 billion of which is attributable to the Tender Offer. To be sure, tendering stockholders and not the Company would receive the consideration paid for shares in the Tender Offer. By the same token, if consummated, the Tender Offer would increase SBG's ownership stake from 43.4% to 69% of the Company's fully-diluted equity or, when combined with Vision Fund, from 52.3% to 77.9% of the Company's fully-diluted equity.[231]

---

[229] *Id.*

[230] *Id.* at 42.

[231] *See* Daines Decl. ¶ 21.

Robert M. Daines, the Priztker Professor of Law and Business and Associate Dean at Stanford Law School, opines in a declaration submitted in support of the Special Committee's opposition to the Rule 41(a) motion: "This increase in SoftBank's equity interest would improve its incentive to increase firm value and reduce the risk that it would extract value from minority stockholders."[232]

The New Committee complains that the Special Committee did not make this point during its investigation,[233] but it seems like a point the New Committee should have considered on its own. The bargain struck in the MTA was that SBG, subject to certain conditions, would invest a total of $9.5 billion in WeWork—not $6.5 billion. It stands to reason that SBG would be more incentivized to improve the Company's value for the benefit of all of its stockholders if it had $3 billion more of its capital at risk in the success of WeWork, particularly in the form of equity.

---

[232] *Id.* ¶ 35; *see also In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *2 (Del. Ch. Jan. 25, 2016) ("The basic insight is a simple one: by virtue of its control over the firm, the controller can direct how that firm deploys its capital. As an equity owner, the controller participates in the resulting benefits (and losses) in proportion to its equity stake, effectively gaining or losing on a *pro rata* basis with other stockholders. By contrast, in a related-party transaction, the controller receives 100% of the benefit while only funding the payment to the extent of its equity stake. The balance of the payment is funded by the unaffiliated equity holders. The economic incentive to tunnel varies inversely with the controller's equity stake. All else equal, as the controller's equity stake declines, the relative benefit from a direct payment increase."); Lucian A. Bebchuck & Kobi Kastiel, *The Perils of Small-Minority Controllers*, 107 Geo. L.J. 1453, 1465 (2019) ("Conversely, whereas a majority owner cannot be replaced and would not be disciplined by the market for corporate control, *her large equity stake in the controlled company provides powerful financial incentives to maximize company value.*" (emphasis added)).

[233] New Comm. Reply Br. 9-10.

Turning to the "harms" side of the equation, apart from the expense of the MTA Litigation, the Report identifies four categories of what more fairly can be characterized as risks to the Company rather than actual harms: (i) the risk that the MTA Litigation "fosters a harmful perception that the Company is financially unstable"; (ii) the "risk to the Company's legal strategy in other litigations and regulatory investigations" arising out of "its failed IPO and subsequent MTA negotiations"; (iii) the risk of procedural uncertainties associated with the MTA Litigation; and (iv) the risk of counterclaims being asserted against the Company.[234]

The last three categories concern risks inherent in complex commercial litigation, *e.g.*, the potential impact of factual findings in one case on other litigations and investigations, potential privilege waiver issues, the potential challenges of structuring a comprehensive settlement, and the omnipresent risk that asserting a claim may prompt counterclaims. The New Committee appropriately identifies these risks but the reality is that they are conjectural and involve issues that sophisticated and well-represented litigants routinely manage in complex litigation.[235]

---

[234] Report at 48-53.

[235] The court shares the New Committee's concern over potential privilege waivers. As a practical matter, however, if the Special Committee seeks to waive the Company's privilege as to some subject matter over the objection of the Company's management, the court will be called upon to resolve the dispute.

From my reading of the Report, the risk of primary concern to the New Committee is that the MTA Litigation "fosters a harmful perception that the Company is financially unstable" and "at war with its largest financial backer" in the eyes of its "landlords, tenants, members, vendors and others."[236] The risk from negative media publicity is certainly a valid concern, but there is a critical shortcoming in the New Committee's assessment of this issue.[237] Specifically, when evaluating the impact of the publicity concerning this case, the Report relies solely on anecdotal evidence and impressions from three senior officers of the Company— the CEO (Mathrani), Chief Legal Officer (Berrent), and CFO (Kim Ross)—and one director (Zhao).[238] Each of these individuals, however, have conflicts that make their impartiality suspect and the Report's unquestioned reliance on them unreasonable.

"Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the

---

[236] Report at 48-49.

[237] Notably, the two articles cited in the Report as evidence of "negative publicity" focus on the dispute arising from the appointment of the New Committee and not on the substance of the MTA Litigation. *See* Report at 48 nn.213 & 214 (citing Andrew Edgecliffe-Johnson, *WeWork Factions Head for Showdown over Director Appointments*, Fin. Times (May 27, 2020), https://www.ft.com/content/0b6aa928-fb51-44af-9162-e54ce243d245; Jef Feeley, *WeWork Board Factions Head for Clash Over New Directors*, Bloomberg (May 28, 2020, 2:45 AM), https://www.bloomberg.com/news/articles/2020-05-28/wework-board-actions-head-for-clash-over-new-directors).

[238] *See* Report at 48-50.

interests of a controller."[239]   Here, not only do SBG and Vision Fund have all the attributes of a control group,[240] the record indicates that SBG, acting through its senior officers, sought to exert its influence over Company management to undermine the MTA Litigation.

The day after the lawsuit was filed, Claure, who was instrumental in hiring Mathrani, sent a not-too-subtle "recommendation" to Mathrani on how he—as SBG's Chief Operating Officer—would like the lawsuit to be messaged, which Mathrani embraced immediately.[241]   Less than ten days later, on the same day SBG sent a letter to the Board challenging the Special Committee's authority, Townsend (SBG's Chief Legal Officer) reprimanded Berrent, telling her that she and Skadden were conflicted with respect to the lawsuit and threatening to have them "recused."[242]   Soon thereafter, Berrent and Skadden both seemed to shift from supporting the MTA Litigation—to the point of commenting on draft complaints under a "common interest privilege"—to becoming its detractors, with Skadden

---

[239] *EZCORP*, 2016 WL 301245, at *35 (collecting authorities).

[240] *See supra* Parts I.A (detailing SBG and Vision Fund's relationship with each other and their equity ownership in WeWork) and I.C (explaining WeWork's governance structure under the Stockholders' Agreement).

[241] *See* Dkt. 402.  The Report defends Mathrani's independence because "his personal financial incentives as CEO are aligned with the Company's long-term success" and his "compensation plan is structured" to afford him liquidity "if he is terminated without cause."  Report at 50.  Even so, it is rarely good for one's reputation to be fired as a senior officer.

[242] Berrent Dep. 34-35, 40.

drafting the game plan to form the New Committee.[243]  These facts, which are not mentioned in the Report, provide good reason to question the views attributed to management on an intangible and subjective subject—the perception of third parties concerning WeWork's financial stability in response to publicity concerning the MTA Litigation.

The Report notes that Zhao "characterized the Litigation as a 'cloud' overhanging the Company's relationships with all its partners."[244]  But the Report omits that Zhao, the CEO of Hony Capital, admitted he was conflicted when the Board established the New Committee because of Hony Capital's interest in ChinaCo—a central issue in the MTA Litigation.[245]  Nor does the Report mention that Robinson and Berrent did not consider Zhao to be independent.[246]

Critically, what is missing from the Report is any objective evidence to verify what management told the New Committee to support its conclusions concerning the asserted harm to the Company from negative publicity.  The Report, for example, does not cite to any emails or other documentary evidence from the Company's

---

[243] *Compare* Part I.F, *with* Part I.I.

[244] Report at 49.

[245] *See* Will Decl. Ex. O, at 2.  The New Committee's memo of Zhao's interview notes that "he was not on the Special Committee because he was a co-investor in WeWork China with SoftBank" and that he was not involved in WeWork's dealings with Trustbridge "because of the conflict."  Will Decl. Ex. W (New Committee June 10, 2020 Interview with Zhao), at 9-10.

[246] *See* Berrent Dep. 42; Robinson Dep. 94.

landlords, tenants, vendors, etc. to corroborate the views management attributed to them. Nor does the Report contain any data reflecting lost revenues or business opportunities caused by the MTA Litigation.[247]

In a brief filed at the New Committee's direction, the Company asserts that the present "dispute boils down to one issue: who should pay the substantial legal fees of Messrs. Dunlevie and Frankfort's affiliates and the subset of minority stockholders who, like them, want to sell their shares to SoftBank."[248] The New Committee's Report, fairly read, does not share that perspective. To be sure, the Report lists as a harm to the Company that "the MTA Litigation is likely to impose significant legal costs on the Company," and notes "that the Company has budgeted over $20 million for the Litigation."[249] But the relevant costs to consider, which are not estimated in the Report, are those that the Special Committee would incur going forward to take this case to trial, which is scheduled to begin in less than three

---

[247] This court has found that a special litigation committee's "decision not to conduct" an analysis of a relevant issue "gives rise to substantial questions concerning the reasonableness and good faith of the [special litigation committee]'s investigation." *Sutherland*, 958 A.2d at 243; *see also Electra Inv. Tr. PLC v. Crews*, 1999 WL 135239, at *5 (Del. Ch. Feb. 24, 1999) (finding "sufficient cause to reject the" conclusions of a special litigation committee where the committee relied exclusively on a conflicted witness and failed to contact any "outside source of information . . . to verify or contradict" the conflicted witnesses "version of the facts"); *Lewis v. Fuqua*, 502 A.2d 962, 967 (Del. Ch. 1985) (finding that a special litigation committee "has not borne its burden of establishing a reasonable basis for" its conclusion).

[248] New Comm. Reply Br. 4.

[249] Report at 52.

months, on March 3, 2021.[250]  This amount is presumptively immaterial to the Company, especially when one considers that the Board had no apparent qualms about spending more than $7 million on the New Committee.[251]

Finally, in its evaluation of the "benefits" and "harms," the New Committee appropriately takes into account what recourse tendering stockholders would have if the MTA Litigation is terminated.[252]  The only viable claim in the Complaint is that SBG and Vision Fund both breached their obligations in the MTA to use reasonable best efforts to consummate the Tender Offer.  The Report acknowledges that tendering stockholders cannot bring this claim directly under the MTA because they are not parties to, or third-party beneficiaries of, that agreement.[253]

---

[250] The Special Committee had incurred over $8 million in attorneys' fees and expenses as of September 30, 2020.  *See* Dkt. 410, at 4.  In response to the court's question, the Company represented in a letter submission after oral argument that it "will not seek to claw back fees that have been paid to the Special Committee's counsel."  *Id.*  That same letter manifested a change in position.  Instead of contending the cost of litigation was the "one issue" the current dispute "boils down to," the letter explains that "the cost of litigation was not the only, or even primary, detriment to the Company that the New Committee considered."  *Id.*  The latter view is a more accurate characterization of the Report.

[251] Dkt. 410, at 4.

[252] *See* Report at 43-44, 56.

[253] *Id.* at 43-44.  The New Committee did not analyze whether a tendering stockholder could bring a claim under the MTA derivatively even though, according to Skadden, they could do so.  *See* Mot. for Leave to Dismiss Compl. Pursuant to Court of Chancery Rule 41(a) Hr'g Tr. at 18-19.  Such a claim, however, could prompt the appointment of a special litigation committee.  *See id.* at 19.

According to the Report, the tendering stockholders' recourse would be limited to asserting that "SBG's frustration of the MTA's closing conditions constituted a breach of the implied covenant of good faith and fair dealing implied in the [Offer to Purchase]."[254] Even if such a claim is equivalent to the claim against SBG for breach of the reasonable best efforts obligations in the MTA, as SBG has represented,[255] the tendering stockholders would not have any apparent recourse against Vision Fund, which also owed an obligation in the MTA to use its reasonable best efforts to satisfy the closing conditions to the Tender Offer.[256] This is because Vision Fund, unlike SBG, was not an offeror in the Tender Offer and thus would not owe any obligations (express or implied) under the Offer to Purchase.[257] This is not inconsequential. Vision Fund was a key player in the ChinaCo Roll-Up, which contemplated that Vision Fund would exchange its shares of ChinaCo for shares of WeWork.[258]

---

[254] *Id.* at 44.

[255] In a recent letter to the court, SBG's counsel represented that "SBG has not argued (and will not argue) that its obligations arising from the implied covenant of good faith and fair dealing under the Offer to Purchase . . . differ from its reasonable best efforts obligations under the Master Transaction Agreement." Dkt. 398, at 1.

[256] *See* MTA §§ 8.03(a), 8.09, 8.12; Will Decl. Ex. A.

[257] *See Gilbert v. El Paso Co.*, 490 A.2d 1050, 1054 (Del. Ch. 1984) (explaining that "[a] tender offer results in formation of a contract" between the offeror and offerree).

[258] *See* MTA Ex. O, at 1.

Further complicating matters, a subset of tendering stockholders—namely WeWork employees who stand to receive approximately $39.8 million if the Tender Offer closes[259]—would confront additional obstacles in seeking recourse if the MTA Litigation is terminated. As the Report explains, many current and former employees are subject to "releases and arbitration agreements" that would impede their ability to litigate claims for themselves.[260]

Recognizing that the tendering stockholders—particularly current and former employees—face significant impediments to litigating claims on their own that are not present in this action, the New Committee makes two recommendations. First, the New Committee "*suggest[s]* that SBG and [Vision Fund] stipulate that the tendering stockholders may bring actions as third-party beneficiaries of the MTA so that they can base their claims on the 'reasonable best efforts' clauses" instead of using the implied covenant of good faith and fair dealing as a proxy.[261] Second, the New Committee asks the Company to "*consider* waiving its right to compel arbitration and its right to enforce . . . any releases given by current or former employees against SBG and [Vision Fund] in employment or separation

---

[259] Report at 43.

[260] *Id.*

[261] *Id.* at 56 (emphasis added).

agreements."[262]   To date, no action has been taken on either of these recommendations.[263]

* * * * *

As previously discussed, the New Committee is not entitled to any presumptions of independence, good faith, or reasonableness on this motion, and has the burden of proof under Rule 56 standards.[264]  Although the court has no reason to doubt the independence and good faith of the New Committee, significant shortcomings and errors exist in its Report that undermine the court's confidence in the reasonableness of its investigation and many of its conclusions.

To summarize, based on the plain language of the Resolutions and the MTA, the court disagrees with the New Committee's conclusion that the Special Committee did not have the authority to file the MTA Litigation.  Also, the court's conclusion that the Special Committee was so authorized is supported by substantial extrinsic evidence that the New Committee should have considered given its apparent belief that the Resolutions were ambiguous.[265]

---

[262] *Id.* at 55 (emphasis added).

[263] *See* Berrent Dep. 131-32.

[264] *Sutherland*, 958 A.2d at 239.

[265] *See id.* at 243 ("In this case, where [a special litigation committee] seeks to wrest control of litigation from 50% stockholders in a closely held corporation, the [special litigation committee]'s decision not to conduct that analysis, but, instead, to omit any mention of [it], gives rise to substantial questions concerning the reasonableness and good faith of the [special litigation committee]'s investigation.").

75

As to its second inquiry, the New Committee did not have a reasonable basis to conclude that the Special Committee members were "no longer sufficiently disinterested" based on a change of circumstances beneficial to the Company (obtaining the final component of the Debt Financing) that they desired to occur and never sought to impede. The New Committee also failed to consider an important question: whether it was foreseeable and the expectation of the parties to the MTA that the Special Committee would be responsible for litigating disputes on behalf of the Company to enforce the terms of the MTA with respect to the Tender Offer, with the Company paying for the litigation expenses, notwithstanding the Special Committee members' personal interests in tendering shares into the Tender Offer?

Finally, as to its third inquiry, the New Committee's comparison of the "benefits" and "harms" of the MTA litigation was flawed on each side of the ledger. As to the benefits, the New Committee did not consider whether holding SBG to the bargain it struck in the MTA by requiring it to complete the Tender Offer would not only benefit the stockholders who tendered, but also would benefit all stockholders of the Company by materially increasing SBG's financial stake in the Company and, commensurately, its incentive to enhance WeWork's value. As to the harms, on what ostensibly was the most important factor in its analysis, the New Committee relied on anecdotal evidence and impressions of three senior officers and one director whose impartiality was suspect. The New Committee also failed to

76

investigate troubling indications concerning the filing and procession of this action, *i.e.*, the reason why the Company's management and its outside counsel made a 180-degree turn from supporting the filing of this action to seeking its dismissal.

For all of the reasons explained above, the court denies the Rule 41(a) motion under the first prong of the *Zapata* test.

### C.    The Second Prong of the *Zapata* Test

The second prong of the *Zapata* standard permits the court "in its discretion" to use "its own independent business judgment" in determining whether the motion to dismiss should be granted.[266]   The Supreme Court described the second prong as follows:

> The second step provides, we believe, the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee. The Court should determine, applying its own independent business judgment, whether the motion should be granted. This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied. The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest. The Court of Chancery of course must carefully consider and weigh how compelling the corporate interest in dismissal is when faced with a non-frivolous lawsuit. The Court of Chancery should, when appropriate, give special

---

[266] *Zapata*, 430 A.2d at 789.

consideration to matters of law and public policy in addition to the corporation's best interests.[267]

The high court further recognized "that the final substantive judgment whether a particular lawsuit should be maintained requires a balance of many factors ethical, commercial, promotional, public relations, employee relations, fiscal as well as legal."[268]

Although it is unusual for the Court of Chancery to apply the second prong of the *Zapata* standard, particularly where the movant has not met its burden under the first prong, it is appropriate to do so here in my view given the unique circumstances of this case. As discussed in Part III.A, while the *Zapata* standard seems to fit this motion better than any of the other standards the parties proposed, there are some meaningful differences between the *Zapata* scenario and this case. Given those differences, and given that this case implicates an issue of first impression, the court will apply the second prong to explain why, in the court's own business judgment, the motion to dismiss should be denied.

As an overarching matter, it is the court's opinion that the Special Committee was authorized under the Resolutions to file and to pursue this action on behalf of the Company for the reasons discussed in Part III.B.2.a, and that it would be

---

[267] *Id.*

[268] *Id.* at 788 (internal quotation marks and alterations omitted).

fundamentally unfair to the minority stockholders who tendered shares into the Tender Offer to dismiss this case now, less than three months before trial. Several factors inform the court's judgment on this issue.

First, one of the animating principles of *Zapata* is that corporations should have a mechanism "to rid themselves of meritless or harmful litigation and strike suits" brought derivatively on behalf of the corporation by a stockholder.[269] That concern is not relevant here. This case does not concern a frivolous claim. To the contrary, the claim for breach of the reasonable best efforts provisions in the MTA is clearly viable. SBG tacitly conceded as much when it did not move under Court of Chancery Rule 12(b)(6) to dismiss the claim for breach of the MTA in the Complaint at issue here or in the Neumann Complaint. The court also has now denied Vision Fund's Rule 12(b)(6) motions to dismiss the same claim against it with respect to both of those pleadings.

Second, if this action was dismissed, the legal options available to stockholders who tendered shares in the Tender Offer (other than Neumann) will be adversely affected for the reasons explained in Part III.B.2.c. The New Committee recognized as much and, to its credit, recommended certain actions to ameliorate those problems.[270] But the New Committee was powerless to fix the problems,

---

[269] *Id.* at 786-87.

[270] *See* Report at 55-56.

which remain in place. Thus, if this case was dismissed, tendering stockholders would have no recourse against Vision Fund for breach of its independent contractual obligation to use its reasonable best efforts to consummate the Tender Offer, and many employees who tendered shares may have no recourse at all. This result is especially troubling because SBG represented to tendering stockholders in the Disclosure Statement—when asking them to provide "required approvals and waivers" to permit the MTA to move forward—that Special Committee member Frankfort would remain on the Board "until the later of . . . the completion of the SoftBank Transactions (including the resolution of any litigation or disputes with SoftBank with respect to the SoftBank Transactions) and . . . the consummation of the Tender Offer."[271]

Our Supreme Court counseled in *Zapata* that in applying the second prong, "[t]he Court of Chancery of course must carefully consider and weigh how compelling the corporate interest in dismissal is when faced with a non-frivolous lawsuit."[272] It was logical for the Supreme Court to refer to the "corporate interest" because *Zapata* concerns derivative claims where any recovery would go to the corporation. But here, in applying *Zapata* by analogy to a non-derivative claim, it is appropriate and necessary in my view—and consistent with the flexibility the

---

[271] Disclosure Statement at 2.

[272] *Zapata*, 430 A.2d at 789.

second prong of *Zapata* affords the Court of Chancery to achieve an equitable result—to consider the interests of the minority stockholders who tendered shares in the Tender Offer and would receive any monetary recovery.

On that point, it would be fundamentally unfair in my opinion to constrain the ability of those stockholders to obtain relief, if the case can be proven, for a breach of SBG and Vision Funds' contractual obligations to use reasonable best efforts to close the Tender Offer. And the practical reality is that the only way the tendering stockholders can make this case is to deny the Rule 41(a) motion, even if that means that the claim for breach of the MTA will be prosecuted under the direction of two directors who have a personal interest in having the Company pay for this litigation.

Third, another practical reality is that this case is poised to be tried in the near future in tandem with essentially the same claim for breach of the MTA in the Neumann Complaint. At the outset of this action, the court granted expedition, albeit not on the schedule the Company requested, so that a trial could occur in early 2021.[273] Enormous effort has been expended taking discovery from around the world, fact discovery is scheduled to be completed by December 24, 2020, and opening expert reports are due on December 29, 2020.[274] It is not clear what would happen next in this litigation with respect to the claims of non-Neumann

---

[273] Mot. for Expedited Proceedings Hr'g Tr. at 51 (April 17, 2020) (Dkt. 66).
[274] Dkt. 506.

81

stockholders who tendered shares in the Tender Offer if the Complaint was dismissed now. But it is clear to me that it would be highly inefficient, not only to those stockholders but with respect to the use of judicial resources, to dismiss this action now and potentially put their claims back on the starting line.

Fourth, the Special Committee's conflict of interest in pursuing this action is certainly a legitimate concern, indeed it is the type of concern about which the Court of Chancery is ever vigilant. But that conflict was foreseeable when the parties entered into the MTA and its significance now appears overstated. The reply brief filed at the direction of the New Committee and prepared by the same counsel that urged the Special Committee to file this action asserts that the present "dispute boils down to one issue: who should pay the substantial legal fees of Messrs. Dunlevie and Frankfort's affiliates and the subset of minority stockholders who, like them, want to sell their shares to SoftBank."[275] The decidedly different tone of the Report, which focuses more on the potential harm to the Company from negative publicity concerning the litigation and less on the use of corporate funds to litigate the case, suggests that the issue before the court is more nuanced and more complicated—and it is.

Not only is it the court's opinion that the Resolutions authorized the Special Committee to file this action on behalf of the Company, we now know with the

---

[275] New Comm. Reply Br. 4.

82

benefit of discovery that the drafter of the Resolutions had the same opinion and that Company management and outside counsel encouraged and approved the Special Committee's filing of this action.[276] They did so knowing full well that corporate funds would be used to pay for any litigation stemming from the MTA, even though the Special Committee members stood to benefit from its outcome. That reality did not prevent them from moving forward. Why? Because that is what the Resolutions and the MTA contemplated.

Put differently, the conflict arising from the Company paying for litigation that could benefit the Special Committee members personally was a "known known" when the Special Committee was formed and was not considered by Company's own Chief Legal Officer and its outside counsel to be disabling when this suit was filed. A mitigating factor with respect to the conflict, furthermore, is that the members of the Special Committee continue to owe fiduciary duties to the Company as they oversee the MTA Litigation and could be held to account for wasting corporate resources if that were to occur.

Fifth, the court does not question the independence of the New Committee's members, who, by all accounts, took their jobs very seriously. But the New Committee's ability to achieve an overall fair result was constrained from the outset. They had two months to conduct an investigation and had to leave the scene after

---

[276] *See supra* Part III.B.2.a.

that. There was another option. The Board could have established a committee of two independent directors with regular terms and a broader mandate affording them the option to take control of the litigation on behalf of the Company in order to eliminate the Special Committee's members conflict and to manage the litigation of the MTA claim through the morass of issues discussed in the Report that often arise in complex commercial litigation. This would have been fair to the minority stockholders who tendered shares and who, if this action was dismissed, would have to litigate with one arm tied behind their backs.

There is an obvious reason why this option was not pursued. The creation of the New Committee was the product of a conflicted Board vote taken at the behest of SBG, the obvious controlling force behind the Company. SBG was and is motivated to put up as many roadblocks as possible to avoid having its actions related to the Tender Offer judged on the merits. Discovery concerning SBG's reaction to the filing of the MTA Litigation also indicates it has not been shy about throwing its weight around to derail the MTA Litigation.[277]

\* \* \* \* \*

In an ideal world, it would be better if the Special Committee members were free of any conflict whatsoever. But clean choices are not on the table. Between the options of (i) dismissing the Company's Complaint now, less than three months

---

[277] *See supra* Part I.H.

before trial, and leaving the tendering stockholders (other than Neumann) in limbo with ostensibly less potent claims to pursue in some other manner and at a date uncertain and (ii) allowing the Special Committee to complete the job it was asked to do and encouraged to undertake, it is the court's business judgment that the latter course is preferable. Accordingly, the Rule 41(a) motion to dismiss must be denied under the second prong of the *Zapata* test for this independent reason.

## IV. CONCLUSION

For the reasons explained above, the Rule 41(a) motion to dismiss the Complaint is DENIED.

**IT IS SO ORDERED.**